IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHNNY R. ADCOCK, on Behalf of
Himself and All Others Similarly
Situated,

       Plaintiff,

   v.

NETBANK, INC., STEVEN F.
HERBERT, and DOUGLAS K.
FREEMAN,

       Defendants.

--------------------------------------------------

ARASH VAHDAT, on Behalf of
Himself and All Others Similarly
Situated,

       Plaintiff,

   v.

NETBANK, INC., STEVEN F.
HERBERT, and DOUGLAS K.
FREEMAN,

       Defendants.

CIVIL ACTION FILE

NO. 1:07-CV-2298-BBM

CLASS ACTION

CIVIL ACTION FILE

NO. 1:07-CV-2631-BBM

CLASS ACTION

## **O R D E R**

This matter is before the court on a number of motions in two separately filed

cases.  Because the court consolidates the two cases, this Order will address all

outstanding motions in both cases.  In the first filed case, known as Adcock v. Netbank, Inc., 1:07-CV-2298-BBM (N.D. Ga.), Robert A. Brown has moved to Consolidate Related Cases, Appoint Lead Plaintiff and Approve Lead Plaintiff's Choice of Counsel [Doc. No. 8].  There is also the Adcock-Collier Movants' Motion for Consolidation, Appointment of Lead Plaintiff, and Approval of Lead Counsel [Doc. No. 9].  Finally, there is the Motion of the Individual Investors for Consolidation, Appointment as Lead Plaintiffs and Approval of Lead Plaintiffs' Selection of Lead Counsel [Doc. No. 13].[1]

In the second-filed case, Vahdat v. NetBank, Inc., No. 07-CV-2631-BBM (N.D. Ga.), all movants seek to consolidate it with the first-filed case, and there are two pending motions that will be addressed by this Order as well:  Motion of Robert A. Brown to Consolidate Related Cases, Appoint Lead Plaintiff and Approve Lead Plaintiff's Choice of Counsel [Doc. No. 2]; and Motion of the Individual Investors for Consolidation, Appointment as Lead Plaintiffs and Approval of Lead Plaintiffs' Selection of Lead Counsel [Doc. No. 3].

---

[1] The court is aware of its obligations under the Private Securities Litigation Reform Act ("PSLRA") to expeditiously decide the question of who shall serve as lead plaintiff, and acknowledges its failure to meet those obligations in this case.  Although the court saw the motions on its list of pending civil motions, it did not appreciate the subject matter of the motions until, admittedly, too much time had passed.

I.    **Factual and Procedural Background**[2]

These actions are brought under the federal Securities Exchange Act of 1934, alleging violations of Sections 10(b) and 20(a). Adcock v. NetBank, Inc., No. 07-CV-2298-BBM (N.D. Ga.), was filed on September 19, 2007, on behalf of a class of persons who acquired NetBank, Inc. ("NetBank") stock between May 1, 2006, and September 17, 2007. NetBank was founded in 1996 as a financial holding company operating a variety of businesses focused on consumer and small business banking and mortgage lending. Shares of NetBank were traded on the NASDAQ securities exchange.

NetBank and its officers, Steven F. Herbert and Douglas K. Freeman, also named defendants, allegedly made a series of materially false and misleading statements that artificially inflated the value of NetBank stock over the course of the class period. Beginning in May 2006, NetBank represented that it was in the process of restructuring the company to rid itself of high-risk, non-conforming mortgage operations, which detracted from the overall performance of its core banking and conforming mortgage businesses. On October 3, 2006, NetBank announced a sale of the servicing rights to $8.5 billion worth of mortgages. It took a $19.3 million loss on the transaction. By November 6, 2006, NetBank stated that it had essentially

---

[2] The facts are recounted from the Complaints, and do not constitute findings of fact by the court.

ended its non-conforming mortgage operations, but did not receive any further financial or other consideration for the remainder of its portfolio. Shortly thereafter, NetBank reported significant losses, over $73 million, for the third quarter of 2006.

On November 9, 2006, NetBank reported that its independent auditor had resigned. NetBank announced a private placement of 6.5 million shares of its common stock, which was designed to generate proceeds of approximately $23.7 million. It emphasized that this move was one of the final steps in its overall restructuring plan. Around the same time, NetBank disclosed that the filing of its Form 10-K might be delayed, which could result in a possible delisting by NASDAQ. NetBank retained a new auditor by February 15, 2007, but informed investors that the Form 10-K might be further delayed. On February 21, 2007, NetBank revealed another large loss for the previous quarter, this time in excess of $86 million. The Form 10-K remained unfiled, and NASDAQ warned NetBank on March 20, 2007, that it was facing delisting. On May 1, 2007, it sold two side operations for $18 million.

Finally, on May 21, 2007, NetBank announced that it was being compelled by bank regulators to consummate a $2.5 billion asset sale, at a loss of between $60 and $70 million, in order to be able to cover its bank deposit obligations under federal law. The share price of NetBank dropped in value by nearly two-thirds over heavy

trading.  On August 6, 2007, NetBank announced that its retail mortgage business was completely valueless, and that it was forced to write off $24.6 million previously recorded as goodwill.  NetBank also revealed that NASDAQ was delisting its common stock from trading.  The Office of Thrift Supervision notified NetBank that it was undercapitalized and needed to submit a capital restoration plan by September 13, 2007.  On August 22, 2007, NetBank announced that it had entered into a settlement in an unrelated lawsuit that would provide it with a cash infusion of $19.25 million.  However, on September 17, 2007, the sale of NetBank's assets that had been announced on May 21 fell through.  Federal regulators subsequently shut down NetBank's banking operations and the company filed for Chapter 11 bankruptcy protection.

Plaintiff Johnny Adcock filed his Complaint on September 17, 2007.  The gist of the Complaint is that NetBank's ongoing representations were fraudulent because they failed to disclose that NetBank's core operations were in fact failing, and that selling off the non-conforming mortgage business would be insufficient to resuscitate the company.  According to the plaintiffs, NetBank repeatedly assured investors that the company would rebound once the non-conforming mortgage business was sold.  On October 22, 2007, a second securities class action was filed by another NetBank investor, Vahdat v. NetBank, Inc., No. 07-CV-2631-BBM (N.D. Ga.).

The <u>Vahdat</u> Complaint is based on the same factual allegations and legal theories and names the same defendants as the <u>Adcock</u> action.

Several plaintiffs have moved for consolidation of the two cases. Three sets of plaintiffs have emerged to contend for the role of lead plaintiff, as designated under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 et seq. The movants are: Robert A. Brown ("Mr. Brown"); Johnny Adcock and Michael Collier (collectively, the "Adcock-Collier Movants"); and Sajid Ali, Moris Simson, and Nathan Topie (collectively, the "Individual Investors"). Mr. Brown purchased the first of his NetBank shares on May 9, 2006, and sold the last of them on May 24, 2007. Mr. Adcock purchased his shares on February 26, 2006, and February 26, 2007. The record does not reflect when or if he sold them. Mr. Collier purchased shares on May 21, 2007, and did not report having sold them. Of the Individual Investors, Mr. Ali purchased shares on May 15, 2007, and sold them as of May 23, 2007. Mr. Simson bought shares beginning on July 27, 2006, and sold them all on October 1, 2007. Finally, Mr. Topie purchased the first of his shares on May 8, 2007, and sold the last of them on August 31, 2007.

II.     <u>Analysis</u>

    A.     **Consolidation**

Pursuant to Federal Rule of Civil Procedure 42, a district court may consolidate cases when the actions involve a common question of law or fact. <u>Hargett v. Valley Fed. Sav. Bank</u>, 60 F.3d 754, 765 (11th Cir. 1995). The actions need not be identical. <u>In re Sunbeam Sec. Litig.</u>, No. 98-8258-CIV-MIDDLEBROOKS, 1998 U.S. Dist. LEXIS 21490, at *6 (S.D. Fla. Dec. 7, 1998). Consolidation of complex actions that are related, particularly securities cases, is an effective use of judicial resources. <u>Id.</u> at *7-8. The <u>Adcock</u> and <u>Vahdat</u> actions are well suited for consolidation. The complaints present nearly identical claims for relief based on the same course of conduct by NetBank. Judicial economy will be well-served by avoiding duplication of discovery, pre-trial issues, and class certification questions in these two very similar cases. <u>See</u> <u>Newman v. Eagle Bldg. Techs.</u>, 209 F.R.D. 499, 502 (S.D. Fla. 2002). Moreover, none of the competing potential lead plaintiffs or the defendants objects to consolidation. For these reasons, consolidation of the <u>Adcock</u> and <u>Vahdat</u> class actions is appropriate.

    B.     **Appointment of Lead Plaintiff**

The PSLRA establishes the procedure for the appointment of a lead plaintiff in a private class action arising under federal securities law. <u>See</u> 15 U.S.C.

§ 78u-4(a)(1). Within 20 days of the date the class action is filed, the plaintiff must publish, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class of the following: (1) the pendency of the action, the claims asserted, and the purported class period; and (2) that, within 60 days of publication of the notice, any member of the purported class may move to serve as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(A)(i).

The statute provides for a rebuttable presumption that "the most adequate plaintiff in any private action" is the person or group that "has either filed the complaint or made a motion in response to a notice . . . ; in the determination of the court, has the largest financial interest in the relief sought by the class; and otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The presumption can be rebutted by proof that the presumptively most adequate plaintiff will not fairly and adequately protect the interest of the class, or is subject to unique defenses that render him incapable of adequately representing the class. Id. § 78u-4(a)(3)(B)(iii)(II).

1.    The presumptive lead plaintiff

Each of the applicants for the lead plaintiff position either filed a complaint or made a motion in response to the notice. The court looks next to the issue of the largest financial interest. "The most important factor in determining the lead

-8-

plaintiff is the amount of financial interest claimed." Newman, 209 F.R.D. at 502; see also In re MicroStrategy Inc. Sec. Litig., 110 F. Supp. 2d 427, 433-34 (E.D. Va. 2000). "Largest financial interest" is not defined, but courts generally examine four factors: "(1) the number of shares purchased during the class period, (2) the number of net shares purchased during the class period, (3) the total net funds expended during the class period, and (4) the approximate loss suffered during the class period." In re Crayfish Co. Sec. Litig., No. 00 Civ.6766IDAB, 2002 WL 1268013, at *4 (S.D.N.Y. June 6, 2002). Other courts simply look to each applicant's total approximate loss. See In re Bally Total Fitness Sec. Litig., No. 04 C 3530, 2005 U.S. Dist. LEXIS 6243, at *14 (N.D. Ill. Mar. 15, 2005) ("We believe that the best yardstick by which to judge 'largest financial interest' is the amount of loss, period.").

The total losses of the applicants for lead plaintiff are as follows. The Adcock-Collier Movants have claimed losses of $49,264.60 during the class period. The Individual Investors report losses of $198,067.87 during the class period. Mr. Brown asserts losses to his personal IRA account of $1,915,827.52, in addition to losses sustained by his wife and other investors for whom he served as custodian.[3] In

_____

[3] The Individual Investors take issue with Mr. Brown's total reported losses of nearly $3 million because the legal instruments that allegedly give him control over the other accounts were not attached to his Motion. Without passing on the merits of this argument, the court need only consider Mr. Brown's personal losses because they exceed the losses claimed by the Individual Investors by almost a multiple of ten.

addition, Mr. Brown purchased the largest number of shares during the class period, and expended the highest total net funds during the class period.[4]   Under either approach, Mr. Brown had the largest financial interest, followed by the Individual Investors.  The Adcock-Collier Movants reported the smallest financial interest, and so will not be considered further unless both Mr. Brown and the Individual Investors fail to otherwise satisfy the requirements of Rule 23.

The Individual Investors argue that Mr. Brown is not entitled to the presumption of lead plaintiff because he did not properly disclose his financial information.  They cite Nager v. Websecure, Inc., No. CIV.A. 97-10662-GAO, 1997 WL 773717, at *1 n.1 (D. Mass. Nov. 26, 1997), for the proposition that the "failure to accurately certify even one transaction in the subject security is a ground for rejecting a lead plaintiff application."  (The Individual Investors' Mem. in Further Supp. of their Mot. for Appointment as Lead Pls. and Approval of Lead Pls.' Selection of Lead Counsel, and in Opp'n to Competing Mots. 4.)  The court in Nager excluded one person from the group appointed as lead plaintiff, because that person had filed an affidavit stating that he purchased shares on a certain date for $17.50

---

[4] Again, considering only Mr. Brown's personal IRA account trading, he purchased a total of 676,589.6963 shares at a total cost of $2,174,043.29.  The Individual Investors together purchased, by the court's calculation, a total of 123,493.8041 shares at a cost of $210,679.97192.  The Adcock-Collier Movants bought a total of 57,000 shares during the class period at a total cost of $53,824.60.

per share.  Other evidence suggested that the share had a price of $9.50 per share on that date.  The judge therefore suspected that the affidavit was a misrepresentation, and excluded the affiant from the lead plaintiff group.  That is consistent with the practice of some courts to refuse to appoint an individual of questionable character as lead plaintiff in a class action.  See Newman, 209 F.R.D. at 504-05.  There is no indication that Mr. Brown has misrepresented or omitted any facts in this proceeding.  Rather, Mr. Brown's submissions reflect that he sold all the shares in his control on May 22 and 24, 2007.[5]  The court has no reason to believe that Mr. Brown engaged in other transactions that he failed to certify.

Furthermore, while it is generally true that a lead plaintiff applicant who does not adequately disclose his financial interest in the action will not be appointed, see In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998), Mr. Brown's application reflects no such shortcoming.  He submitted a detailed list of each transaction, the number of shares traded, and the price per share.  By contrast, the In re Olsten applicants, who were subsequently rejected, had no facts in support of their bald assertions of financial interest.  Mr. Brown submitted an appropriately detailed summary of his purchases and sales of NetBank stock.  He has adequately

---

[5] In fact, the court has double-checked Mr. Brown's math and found that he indeed purchased a total of 676,589.6963 shares and sold a total of 676,589.6963 shares, as he represented in his submission to the court.  The court has found no evidence of any undisclosed transactions by Mr. Brown.

and fully disclosed his financial interest, and it is the largest financial interest of the lead plaintiff applicants.   Therefore, unless Mr. Brown does not satisfy the requirements of Rule 23, he is the presumptive lead plaintiff.

Rule 23 requires that (1) the class is so numerous that joinder of all members is impracticable: (2) there are questions of law or fact common to the class; (3) the claims of the representative are typical of the claims of the class; and (4) the representative will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  The latter two elements, typicality and adequacy, are the only ones relevant to the lead plaintiff determination, and the inquiry is less stringent at this point in the litigation.  See In re Crayfish, 2002 WL 1268013, at *4; In re Olsten, 3 F. Supp. 2d at 296 ("At this stage in the litigation, the party moving for lead plaintiff of the consolidated action need only make a preliminary showing that it satisfies the typicality and adequacy requirements of Rule 23.").  One's claim is typical when it arises from the same course of events and relies on similar legal arguments to prove the defendant's liability.  In re MicroStrategy, 110 F. Supp. 2d at 435.  Adequacy is satisfied where the potential lead plaintiff does not have adverse interests to those of the class, has retained competent counsel, and is otherwise competent to serve as class representative.  Id. at 435-36.

Mr. Brown satisfies the typicality and adequacy requirements.  His claim arises from the alleged misrepresentations made by NetBank and relies on the same legal arguments as the other claimants.  His claims need not be identical for them to be typical.  See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., 229 F.R.D. 395, 412 (S.D.N.Y. 2004) ("That CalPERS has raised several theories of liability and recovery not present in Empire's complaint and named defendants . . . not named by Empire does not diminish the similarity between Empire's legal arguments and those of other class members . . . .").  He has no conflicts that would preclude him from effectively representing the interests of the other class members, and has represented that he will vigorously prosecute this action.  Therefore, Mr. Brown is the presumptive lead plaintiff.

> 2.     The presumption is rebuttable

There are two factors that will be considered to rebut the statutory presumption:  evidence that the presumptive lead plaintiff will not fairly and adequately protect the interests of the class, or that he is subject to unique defenses that render him incapable of adequately representing the class. In re MicroStrategy, 110 F. Supp. 2d at 436.  The Individual Investors make two related arguments in an attempt to rebut the presumption of Mr. Brown as lead plaintiff.

The first is similar to their above assertion that Mr. Brown has not adequately disclosed his financial information.  This argument is really speculation about what Mr. Brown could have done during the period from May 25, 2007 to September 17, 2007.  They argue that "there is no way to accurately calculate [Mr. Brown's] true losses or to know all the special defenses that [Mr.] Brown may be subject to that would undermine his typicality and adequacy required by Rule 23."  (The Individual Investors' Mem. in Further Supp. of their Mot. for Appointment as Lead Pls. and Approval of Lead Pls.' Selection of Lead Counsel, and in Opp'n to Competing Mots. 8.)  Such conjecture is not evidence.  As the court has already discussed, there is nothing to indicate that Mr. Brown engaged in transactions that he failed to disclose.  The Individual Investors are required to come forward with *proof* to rebut the presumption that Mr. Brown is not a proper lead plaintiff.  They have failed to do so.

Second, the Individual Investors argue that Mr. Brown should not be named lead plaintiff because he sold his shares as of May 2007 and thus will not be able to prove loss causation for losses incurred after that date.  The Individual Investors allege that additional misrepresentations and curative disclosures took place on August 6, August 22, and September 17, 2007.  In addition, both the Vahdat and the Adcock Complaints define the class period as running through September 17, 2007.

For these reasons, they argue, Mr. Brown is an atypical class member who will be subject to unique defenses, and is inadequate to represent the class of all plaintiffs, some of whom suffered losses through September 17, 2007.

The court views this argument as the Individual Investors' attempt to create four discrete events out of what was instead a pattern of ongoing misrepresentations about the performance of NetBank's core business.    All of the alleged misrepresentations arose from the same pattern or practice of alleged fraud that began, according to the Complaint, as early as May 2006. (See, e.g., Adcock Compl. ¶ 2.)   A typical class representative under Rule 23 may have factual variations between his claims and the claims of other class members.  "A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984) (citations omitted). The important inquiry is whether the proposed representative's claims have the "same essential characteristics" as those of the proposed class. Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 n.14 (11th Cir. 2000) (internal quotations and citations omitted).  In fact, "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences."    Id. (internal quotations and citation omitted).  This case presents identical legal theories, based

on Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The factual differences between the lead plaintiff applicants are minor. Both Mr. Brown and the Individual Investors owned shares beginning in 2006 and held them through the first major disclosure by NetBank on May 21, 2007.[6]

The Individual Investors argue that Mr. Brown does not meet the adequacy prong of Rule 23 because his interests conflict with the interests of other class members. "Only conflict that is serious and irreconcilable will be fatal." Fischler v. AMSouth Bancorporation, No. 96-1567-Civ-T-17A, 1997 WL 118429, at *3 (M.D. Fla. Feb. 6, 1997) (internal quotations and citation omitted). In In re OCA, Inc. Securities and Derivative Litigation, No. 05-2165 (E.D. La. Nov. 18, 2005) [Doc. No. 25-2], the court found such a conflict. There, a lead plaintiff applicant with the largest financial interest, Cannell Capital, was rendered inadequate because it had sold all its shares before the defendant's June 7, 2005, announcement that it would restate its financial results for the first three quarters of 2004, which was the event that gave rise to the class action. Cannell Capital argued that it still owned shares at the time of a press release issued by the defendant on March 17, 2005, which announced that the company would delay filing its 2004 Form 10-K. Cannell Capital argued that this March 17, 2005 press release was a partial disclosure of the fraud. The court

_____

[6] The Individual Investors' disclosures show that Mr. Simson was the earliest purchaser in that group, buying his first shares of NetBank on July 27, 2006.

-16-

rejected this argument and found that Cannell Capital would have trouble proving

loss causation and might be forced to take legal positions adverse to other plaintiffs

in the class.[7] Id., slip op. at 11-13.  Cannell Capital was thus found to have a conflict

with other members of the class, and so was rejected as lead plaintiff.

The court in In re Scientific-Atlanta, Inc. Securities Litigation, No. 1:01-CV-

1950-RWS, --- F. Supp. 2d ----, 2007 WL 2683729 (N.D. Ga. Sept. 7, 2007) (Story, J.),

faced a similar issue.  In that case, an alleged pattern of ongoing fraud came to light

after two curative disclosures, one in July and one in August, both of which

allegedly caused losses for the proposed class.  In certifying the class, Judge Story

found that the only shareholders whose claims were not typical of the class were

those who sold their stock prior to the first July disclosure. Id. at *7.  In both these

cases, a potential lead plaintiff or class representative was disqualified because he

likely could not state a claim for recovery at all.  Both sold their interest in the

defendant company before what was arguably the first corrective disclosure.  Class

members who divest themselves of their shares prior to any curative disclosures do

not suffer any loss due to artificial share price inflation, and thus would be unable

to show loss causation.  The same point was made by the court in In re

---

[7] For example, Cannell Capital argued that plaintiffs who purchased stock after the March 17 press release did so with knowledge of the company's accounting problems. In re OCA, slip op. at 13.

MicroStrategy, in which one of the lead plaintiff applicants was disqualified because its own evidence "suggested that most of its losses occurred *before* defendants issued *the first correction*." In re MicroStrategy, 110 F. Supp. 2d at 437 n.23 (second emphasis added).

Here, there can be no argument that Mr. Brown would face the unique defense of inability to prove loss causation. He owned his shares through what is alleged and appears to be the agreed-upon beginning of NetBank's disclosure of fraud: May 21, 2007, the date that NetBank "shocked" the financial community by disclosing extreme deficiencies in its core banking business.[8] (Adcock Compl. ¶ 2;

---

[8] On this date, NetBank "disclosed *for the first time*" that it was forced to sell its core assets to cover its bank deposit obligations. (Vahdat Compl. ¶ 87 (emphasis added); see also id. ¶ 88; Adcock Compl. ¶ 85.) The Individual Investors argue at one point that the May 21, 2007, disclosure was only a partial disclosure. (See The Individual Investors' Mem. in Further Supp. of Their Mot. for Appointment as Lead Pls. and Approval of Lead Pls.' Selection of Lead Counsel, and in Opp'n to Competing Mots. 18.) In re Seagate Technology II Securities Litigation, 843 F. Supp. 1341 (N.D. Cal. 1994), discussed potential conflicts between class members who purchased and sold securities at different times during the class period. The court observed that such conflicts are more problematic in cases that involve partial curative disclosures, because partial disclosures of fraud eliminate price inflation a little at a time, rather than all at once. Id. at 1359, 1364-65. Therefore, Mr. Brown could have a conflict with other class members under the In re Seagate reasoning because he would have an incentive to maximize the deflationary impact of the May 21, 2007, disclosure and disregard the later disclosures. The court does not believe that such a theoretical conflict is enough to render Mr. Brown an inadequate lead plaintiff at this point. A majority of courts have declined to follow the reasoning in In re Seagate and this court is not persuaded to deviate from that consensus. See In re Scientific-Atlanta, 2007 WL 2683729, at *11-12; In re Miller Indus., Inc. Sec. Litig., 186 F.R.D. 680, 686-87 (N.D. Ga. 1999) (Thrash, J.); see also In re Baan Co. Sec. Litig., No. 1:98CV2465 (ESH), 2002 WL 32307825, at *7 (D.D.C. July 19, 2002); In re Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 70-71 (S.D.N.Y. 1999); Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 394-95 (D.N.J. 1998).

Mem. of Law in Supp. of Robert A. Brown's Mot. to Consolidate Related Actions, Appoint Lead Pl. and Approve Lead Pl.'s Choice of Counsel 7; Mem. of Law in Supp. of Mot. of the Individual Investors for Consolidation, Appointment as Lead Pls., and Approval of Lead Pls.' Selection of Lead Counsel 5.)   The court acknowledges that Mr. Brown sustained no losses after May 24, 2007, and so in theory might have "a strong disincentive to prosecute this action for that [later] period."   Burke v. Ruttenberg, 102 F. Supp. 2d 1280, 1342 (N.D. Ala. 2000). However, courts in this district have rejected as a ground to deny class certification such theoretical conflicts between buyers and sellers during the class period.[9] See In re Scientific-Atlanta, 2007 WL 2683729, at *11-12; In re Miller Indus., Inc. Sec. Litig., 186 F.R.D. 680, 686-87 (N.D. Ga. 1999) (Thrash, J.); see also In re Baan Co. Sec.

---

[9] Other cases have discussed the problems presented by potential lead plaintiffs who are "net sellers," meaning they sold more shares than they purchased during the class period.  Some courts reject such plaintiffs as lead plaintiffs because they may have more trouble proving damages at trial.  Frank v. Dana Corp., 237 F.R.D. 171, 172-73 (N.D. Ohio 2006); see, e.g., In re McKesson HBOC, Inc. Sec. Litig., 97 F. Supp. 2d 993, 996-97 (N.D. Cal. 1999) ("A net purchaser will, presumably, have a greater interest in the litigation, because he or she was induced by the fraud to purchase shares, and has been left 'holding the bag' when the fraudulent inflation is revealed. By contrast a net seller has arguably *profited* more from the fraud than it has been injured, possibly reducing its incentive to litigate.") (footnote omitted).  However, to the extent that Mr. Brown could be considered a net seller, such status does not preclude lead plaintiff status.  The more important factor is whether one is a net gainer or a net loser.  A net seller who nonetheless suffered a loss can still prove damages, and therefore is still qualified to serve as lead plaintiff.  See Richardson v. TVIA, Inc., No. C-06-06304 RMW, 2007 U.S. Dist. LEXIS 28406, at *12-13 (N.D. Cal. Apr. 16, 2007); Frank, 237 F.R.D. at 173; Crossen v. CV Therapeutics, Inc., et al., No. C 03-3709 SI, slip op. at 6-7 (N.D. Cal. Nov. 21, 2003).  Mr. Brown unquestionably lost money on his NetBank shares.

Litig., No. 1:98CV2465 (ESH), 2002 WL 32307825, at *7 (D.D.C. July 19, 2002); In re

Gaming Lottery Sec. Litig., 58 F. Supp. 2d 62, 70-71 (S.D.N.Y. 1999).

The plaintiffs in this case have alleged a pattern of fraudulent

misrepresentations spanning a class period of nearly a year and a half. The amount

of price inflation based on those misrepresentations that existed at any particular

sale date relates to the amount of an individual member's damages. Discrepancies

among class members on that issue will not defeat class certification on the

adequacy prong. See In re Scientific-Atlanta, 2007 WL 2683729, at *12. They do not

render a lead plaintiff applicant inadequate either. Both Complaints allege ongoing

fraudulent misrepresentations throughout the class period, and all lead plaintiff

movants owned shares during the class period. The lead plaintiff in this case will

be the one with the largest financial interest, Mr. Brown. The Individual Investors

have failed to rebut the presumption. Furthermore, the selection of the lead plaintiff

occurs prior to class discovery, and the court may always alter its choice if the choice

proves detrimental to the interests of the class. See In re Oxford Health Plans, Inc.,

191 F.R.D. 369, 373 (S.D.N.Y. 2000). For now, the court finds Mr. Brown to be the

most adequate plaintiff under the PSLRA, and he is appointed lead plaintiff.

C.      **Appointment of Lead Counsel**

The most adequate plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). The court can override the lead plaintiff's choice of counsel if necessary to protect the interests of the class. In re Crayfish, 2002 WL 1268013, at *6. The court believes that Mr. Brown's proposed lead counsel, Berger & Montague, P.C., is qualified to conduct the litigation. There were no objections to this counsel by the Individual Investors or the Adcock-Collier Movants, and the court is not independently aware of any reason why Berger & Montague should not be approved. Therefore, Berger & Montague is approved as lead counsel, with Mr. Gorby serving as local counsel.

III.    **Conclusion**

For the foregoing reasons, in the case of Adcock v. Netbank, Inc., 1:07-CV-2298-BBM (N.D. Ga.), the Motion of Robert A. Brown to Consolidate Related Cases, Appoint Lead Plaintiff and Approve Lead Plaintiff's Choice of Counsel [Doc. No. 8] is GRANTED. The Adcock-Collier Movants' Motion for Consolidation, Appointment of Lead Plaintiff, and Approval of Lead Counsel [Doc. No. 9] and the Motion of the Individual Investors for Consolidation, Appointment as Lead Plaintiffs and Approval of Lead Plaintiffs' Selection of Lead Counsel [Doc. No. 13] are GRANTED IN PART and DENIED IN PART. Robert A. Brown is appointed

lead plaintiff in this action, and Berger & Montague (together with Mr. Gorby as local counsel) is appointed lead counsel.

In <u>Vahdat v. NetBank, Inc.</u>, No. 07-CV-2631-BBM (N.D. Ga.), the Motion of Robert A. Brown to Consolidate Related Cases, Appoint Lead Plaintiff and Approve Lead Plaintiff's Choice of Counsel [Doc. No. 2] is GRANTED.  The Motion of the Individual Investors for Consolidation, Appointment of Lead Plaintiffs and Approval of Lead Plaintiffs' Selection of Lead Counsel [Doc. No. 3] is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED, this 21st day of April, 2008.

s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE