IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE NETBANK, INC. SECURITIES LITIGATION | | CIVIL ACTION FILE NO. 1:07-CV-2298-BBM |

**O R D E R**

This matter is before the court on the Motion for Class Certification [Doc. No. 68], filed by lead plaintiff Robert A. Brown ("Mr. Brown"); the Motion to Compel [Doc. No. 67] filed by Defendants Douglas K. Freeman, James P. Gross, Steven F. Herbert, Thomas H. Muller, Jr., Eula L. Adams, and David W. Johnson, Jr. (collectively "Defendants")[1]; the Motion to Compel Responses to Plaintiff's First Set of Document Requests and Interrogatories [Doc. No. 75] filed by Mr. Brown; and the Motion for Leave to File a Sur-Reply in Opposition to Motion for Class Certification [Doc. No. 104] filed by Defendants.

I.    **Factual and Procedural Background**

This court's Order on the Motion to Dismiss [Doc. No. 47] contained a comprehensive discussion of the facts of this case, which will not be repeated here.

---

[1]Defendant Catherine Ghiglieri was dismissed from the case without prejudice on September 15, 2008. (Stipulation of Dismissal as to Def. Catherine A. Ghiglieri, filed Sept. 12, 2008.)

(Order, Jan. 29, 2009 at 1-8.)  On April 17, 2009, Mr. Brown, individually and on behalf of all other persons and entities similarly situated, filed a Motion for Class Certification [Doc. No. 68].  The Motion requests that the court (1) certify the consolidated action as a class action on behalf of "all persons who, during the period March 16, 2005 through and including May 21, 2007 (the "Class Period"), purchased or otherwise acquired the publicly-registered common stock of NetBank, Inc. ("NetBank" . . . ), and held such stock as of May 21, 2007, and were damaged as a result (the "Class")"; (2) certify Mr. Brown as the representative of the Class; and (3) approve Mr. Brown's counsel, Berger & Montague, P.C., as class counsel to the litigation.  (Mot. for Class Certification 2.)  Defendants filed a Motion to Compel on April 3, 2009, and Mr. Brown filed a Motion to Compel on May 27, 2009.

## II.    **Legal Standard**

Federal Rule of Civil Procedure 23 governs the certification and management of class actions in the federal courts.  The Rule provides that a class action may be maintained only if the individual plaintiff bringing the action is qualified to represent the class in accordance with the four prerequisites found in subsection 23(a), and only if the action is one of the three types identified in subsection 23(b).  See Fed. R. Civ. P. 23(a) & (b); Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir. 1987).

As an initial matter, the trial court must perform a "rigorous analysis" to ensure that Rule 23(a)'s prerequisites are satisfied. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982); Gilchrist v. Bolger, 733 F.2d 1551, 1555 (11th Cir. 1984). Specifically, Rule 23(a) requires a plaintiff to show that

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements commonly are referred to as the prerequisites of numerosity, commonality, typicality, and adequacy of representation, and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." Piazza v. Ebsco Indus., Inc., 273 F.3d 1341, 1346 (11th Cir. 2001) (citations and internal quotations omitted). In certifying a class, the court must conduct an independent inquiry to ensure that the requirements of Rule 23(a) have been met. See Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1188 (11th Cir. 2003) (citing Martinez-Mendoza v. Champion Int'l Corp., 340 F.3d 1200, 1216 n.37 (11th Cir. 2003)) (noting that even where undisputed "a court nevertheless has the responsibility of conducting its own inquiry as to whether the requirements of Rule 23 have been satisfied in a particular case").

If the action satisfies Rule 23(a), the court turns to the requirements of Rule 23(b), which provides, in pertinent part, that a class may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see also Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1233 (11th Cir. 2000).  This necessitates that  "the issues in the class action . . . are subject to generalized proof, and thus applicable to the class as a whole, [and] must predominate over those issues that are subject only to individualized proof."  Kerr v. City of W. Palm Beach, 875 F.2d 1546, 1558 (11th Cir. 1989) (citation and internal quotations omitted).

Within the parameters of Rule 23's subsections (a) and (b), "[i]t is well settled that questions concerning class certification are left to the sound discretion of the district court." Freeman v. Motor Convoy, Inc., 700 F.2d 1339, 1347 (11th Cir. 1983). In addition, the burden of establishing the propriety of class certification lies with the moving party.  Hudson v. Delta Air Lines, Inc., 90 F.3d 451, 456 (11th Cir. 1996). Importantly, "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Miller v. Mackey

Int'l, Inc., 452 F.2d 424, 427 (5th Cir. 1971)[2]; see also Valley Drug, 350 at 1188 n.15

("[T]he trial court can and should consider the merits of the case to the degree

necessary to determine whether the requirements of Rule 23 will be satisfied.").

## III.   Analysis

The court will first analyze class certification pursuant to Rules 23(a) and

23(b)(3).  It will then address the parties' Motions to Compel.

### A.   Federal Rule of Civil Procedure 23(a)

The court now addresses the Rule 23(a) requirements for class certification.

Notably, Defendants do not dispute the Plaintiffs' satisfaction of these four

requirements.[3]  (See Mem. in Opp'n to Mot. for Class Certification 3.)

#### 1.   Numerosity

As noted above, Rule 23(a) provides that a class may not be certified unless

it is "so numerous that joinder of all members is impracticable."  Fed. R. Civ.

P. 23(a)(1).  "In order to satisfy this requirement, plaintiff need not allege the exact

number and identity of the class members, but must only establish that joinder is

impracticable through 'some evidence or reasonable estimate of the number of

---

[2]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all decisions of the Fifth Circuit rendered prior to October 1, 1981 as binding precedent.

[3]Throughout this Order, the court uses the term "Plaintiffs" despite recognizing that certification of the class is currently at issue.

purported class members.'" Anderson v. Bank of the S., 118 F.R.D. 136, 145 (M.D. Fla. 1987) (quoting Zeidman v. J. Ray McDermott & Co., 651 F.2d 1030, 1038 (5th Cir. 1981)). In this regard, the court observes that "the prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities." Zeidman, 651 F.2d at 1039.

NetBank states that during the proposed Class Period, its common stock was listed and actively traded on the NASDAQ. (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification 8.) Furthermore, NetBank alleges, and Defendants do not dispute, that at that time, there "were more than 46 million shares of NetBank common stock outstanding, whose beneficial holders are undoubtedly spread across the nation." (Id.) Therefore, the court finds that the numerosity requirement of Rule 23(a) has been met.

### 2.    Commonality

Rule 23(a) also requires that a class may not be certified unless "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A "common" issue is one that may be proved through the presentation of generalized proof applicable to the class as a whole. Murray v. Auslander, 244 F.3d 807, 811 (11th Cir. 2001). The Eleventh Circuit has described this provision as requiring only that "[t]he claims actually litigated in the suit . . . simply be those fairly represented by the

named plaintiffs," noting that "Rule 23 does not require that *all* the questions of law and fact raised by the dispute be common." Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1557 (11th Cir. 1986) (emphasis added).   In other words, the commonality provision "does not require complete identity of legal claims." Johnson v. Am. Credit Co. of Ga., 581 F.2d 526, 532 (5th Cir. 1978).

In satisfying the commonality requirement, the plaintiff must show "a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification"—or demonstrate that his "claims share the same essential characteristics as the claims of the class at large." In re Scientific-Atlanta, Inc. Sec. Litig., 571 F. Supp. 2d 1315, 1325 (N.D. Ga. 2007) (Story, J.) (citations and internal quotations omitted). "Generally, where plaintiffs allege that the action is a result of a unified scheme to defraud investors, the element of commonality is met." Avery v. Uniroyal Tech. Corp., No. 8:02CV2238T27MAP, 2005 WL 1205607, at *3 (M.D. Fla. 2005); see also Cheney v. Cyberguard Corp., 213 F.R.D. 484, 491 (S.D. Fla. 2003) (finding commonality had been satisfied where the case involved, *inter alia*, allegations "of a unified scheme to defraud investors through misrepresentations and omissions of information."); Walco Invs., Inc. v. Thenen, 168 F.R.D. 315, 325 (S.D. Fla. 1996)

(finding commonality requirement met where the plaintiffs alleged a unified scheme to defraud investors).

The lead plaintiff, Mr. Brown, alleges that NetBank and the Defendants "made material misrepresentations or omissions regarding [NetBank] through publicly disseminated statements—*i.e.*, press releases, filings with the SEC, and conference calls—that affected all members of the proposed Class by perpetrating a fraud on the market." (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification 10.) Mr. Brown explains that Defendants' alleged false and misleading statements and omissions were uniformly made to all members of the proposed Class. Mr. Brown also lists a number of common questions, including: (1) whether federal securities laws were violated by Defendants; (2) whether federal securities laws were violated by NetBank; (3) whether the previously described publicly disseminated statements misrepresented or omitted material facts about NetBank's financial results, operations, and condition; (4) whether these statements were materially false and misleading; (5) whether NetBank and the Defendants acted with knowledge or sufficient reckless disregard for the truth in misrepresenting and/or omitting material facts; (6) whether the market price of NetBank's common stock was artificially inflated during the Class Period due to the omissions and/or material misrepresentations at issue; (7) whether NetBank and the Defendants

participated in and pursued the common course of deceptive and reckless conduct as alleged; (8) whether the individual Defendants were "control persons" within the meaning of Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"); and (9) whether the members of the Class have sustained damages, and if so, the extent of these damages. (Id. at 10-11.)

The allegations in the Amended Complaint demonstrate that the claims in this case arise out of facts common to all the proposed class members, and are based on legal theories apparently common to all the proposed class members. Mr. Brown has alleged, on behalf of himself, that the Defendants essentially participated in a unified scheme to defraud investors. Accordingly, the court concludes that the commonality requirement of Rule 23(a) is likewise satisfied. See Cheney, 213 F.R.D. at 491.

### 3.    Typicality

As also noted above, Rule 23(a) provides that a class may not be certified unless "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This "typicality" requirement seeks to ensure that a representative plaintiff "possess[es] the same interest and [has] suffer[ed] the same injury shared by all members of the class he represents."

Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974).[4]

> In other words, there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class.  A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.  Typicality, however, does not require identical claims or defenses.  A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class.

Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984).  Both commonality and typicality serve to determine "whether under the particular circumstances maintenance of a class action is economical."  In re MIVA, Inc., Sec. Litig., No. 2:05-cv-201-FtM-29DNF, 2008 WL 681755, at *3 n.2 (M.D. Fla. Mar. 12, 2008).

Mr. Brown argues that typicality is met because his claims arise from the same events and misconduct, and are based on the same legal theories, as the absent Class members' claims.  (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification 13.)  Mr. Brown explains that the claims in the case arise from allegations that

---

[4]While the requirements of commonality and typicality "tend to overlap," Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir. 1985), overruled on other grounds by Green v. Mansour, 474 U.S. 64 (1985), the Eleventh Circuit has explained that "commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class."  Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000).

Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by publicly disseminating a series of material, false and misleading statements. (Id.) Further, he says that he and the Class members purchased NetBank common stock at prices inflated by these misrepresentations, and because of their reliance were consequently damaged. In turn, the common claims "revolve around proof of Defendants' misrepresentations and omissions about NetBank." (Id.) Mr. Brown concludes that by proving his own claims, he will "necessarily prove the other Class members' claims as well." (Id. at 14.)

The court finds that there is a sufficiently close nexus between "the individual characteristics" of the lead plaintiff's own claims and those he seeks to assert on behalf of the potential members of the class. See Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000). Therefore it finds that Mr. Brown has satisfied Rule 23(a)'s typicality requirement.

### 4.    Adequacy

Finally, Rule 23(a) requires that the court ensure that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent," Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997), and "involves questions of

whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation."  Griffin v. Carlin, 755 F.2d 1516, 1533 (11th Cir. 1985).

"[A] principal factor in determining the appropriateness of class certification is the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class."  Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 726 (11th Cir. 1987) (citation and internal quotations omitted).  The court notes, however, that

> adequate class representation generally does not require that the named plaintiffs demonstrate to any particular degree that individually they will pursue with vigor the legal claims of the class.  Although the interests of the plaintiff class certainly would be better served if the named plaintiffs fully participate in the litigation, the economics of the class action suit often are such that counsel have a greater financial incentive for obtaining a successful resolution of a class suit than do the individual class members.  It is not surprising, then, that the subjective desire to vigorously prosecute a class action . . . quite often is supplied more by counsel than by the class members themselves.

Id. at 727 (internal citations omitted).  Accordingly, although "a potential class is entitled to more than blind reliance upon even competent counsel by uninterested and inexperienced representatives," id. (citation and internal quotations omitted),

> in securities cases . . . where the class is represented by competent and zealous counsel, class certification should not be denied simply because of a perceived lack of subjective interest on the part of the named plaintiffs unless their participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case.

Id. at 728.

Mr. Brown states that he "far exceeds the minimal requirements necessary to be an adequate class representative." (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification 15.) He argues that instead of there being any conceivable conflicts of interest between himself and the proposed Class members, their collective interests are "plainly aligned." (Id.) Mr. Brown explains that he, like the proposed Class members, incurred a substantial loss on his NetBank investments, caused by the alleged wrongdoing of Defendants. He also asserts that he "possesses the integrity and track record to act as a fiduciary and represent and protect the interests of a class in shareholder litigation." (Id.) In support, Mr. Brown states that he also served as the lead plaintiff in a recently settled class action securities litigation case called Brown v. Kinross Gold U.S.A., Inc., No. CVS020605PMPRJJ (D. Nev.). In fulfilling his obligations to the class, Mr. Brown says that he regularly consulted with the class counsel, participated in strategy discussions, reviewed pleadings and orders throughout the case, and participated extensively in the settlement process. He says that here, he is likewise committed to devoting the time and effort necessary to prosecute the litigation on behalf of the Class he seeks to represent. Finally, Mr. Brown explains that he has selected Berger & Montague, P.C. to represent himself and the proposed Class, and that the firm "is highly experienced in prosecuting complex securities class actions." (Pl.'s Mem. of Law in Supp. of Mot. for Class

Certification 17 n.9.)  He states that Berger & Montague have successfully litigated a number of securities class actions as lead or co-lead counsel in the Northern District, as well as throughout the United States.  (Id.)

The court finds that there have been no issues raised as to potential conflicts of interest between Mr. Brown and the class that he seeks to represent.  Likewise, Mr. Brown has sufficiently alleged, and Defendants do not dispute, that the counsel representing Mr. Brown "are qualified, experienced, and generally able to conduct the proposed litigation."  Griffin, 755 F.2d at 1533.  Thus, the adequacy requirement of Rule 23(a)(4) has also been met.

The four elements of Rule 23(a) having been satisfied, the court now turns its analysis to the requirements of Rule 23(b).

### B.    Federal Rule of Civil Procedure 23(b)

As noted above, a class action may not be maintained unless "'it satisfies all the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b).'"  Rutstein, 211 F.3d at 1233 (quoting Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997)).  Mr. Brown seeks certification under subsection (3) of Rule 23(b), which provides, in relevant part, that an action may be maintained as a class action if "the court finds that the questions of law or fact common to class members predominate over any questions affecting

only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The key to certification of a class under Rule 23(b)(3) is whether the efficiency and economy of class adjudication outweighs the difficulties and complexity of individual adjudication." AAL High Yield Bond Fund v. Ruttenberg, 229 F.R.D. 676, 681 (N.D. Ala. 2005). The following is a non-exhaustive list of factors pertinent to the court's findings in this regard:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The court first analyzes the predominance element, followed by a superiority analysis.

### 1.    Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., 521 U.S. at 623. As stated previously, the Rule requires that the issues in the class action subject to generalized proof predominate over those issues subject to individualized proof. Rutstein, 211 F.3d at 1233. In other words, "resolution of the common questions [must] affect all or a substantial number of the class members."

In re Tri-State Crematory Litig., 215 F.R.D. 660, 692 (N.D. Ga. 2003) (Murphy, J.) (citations and internal quotations omitted).  "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish . . . the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)."  Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004).

"To determine whether common questions predominate, we are called upon to examine the cause[s] of action asserted in the complaint on behalf of the putative class."  Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003) (citation and internal quotations omitted).  The Amended Complaint lists two bases for relief:  (1) violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and (2) violation of § 20(a) of the Exchange Act.  In order to determine whether Rule 23(b)(3)'s predominance requirement is satisfied, the court considers the requirements necessary to prevail on these claims, and whether the elements of the claims are "susceptible to class-wide proof."  In re Scientific-Atlanta, 571 F. Supp. 2d at 1336.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must show:  "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury."  Ziemba v. Cascade Int'l,

Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) (citation and internal quotations omitted).[5]

Regarding the reliance prong, plaintiffs who proceed under a traditional fraud theory must usually prove actual, individualized reliance on the material misstatement or omission, which precludes resolution of the claim through a class action.  See Castano v. Am. Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996).  However, the Supreme Court has stated that "modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases, and our understanding of Rule 10b-5's reliance requirement must encompass these differences."  Basic Inc. v. Levinson, 485 U.S. 224, 243-44 (1988) (footnote omitted).  The Court noted that recent empirical studies had confirmed Congress' premise "that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."  Id. at 246.  Consequently, the Basic Court adopted the "fraud on the market" theory, "which relieves the plaintiff of the burden of proving actual, individualized reliance on a defendant's misstatement by permitting a

---

[5]In order to state a claim for a violation of § 20(a), a plaintiff must allege (1) a primary violation of securities laws by the corporation; (2) authority on the part of individual defendants to control general business affairs of the corporation; and (3) requisite power on the part of individual defendants to directly or indirectly control or influence specific corporate policy that resulted in primary liability.  Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008).

-17-

rebuttable presumption that the plaintiff relied on the 'integrity of the market price,' which incorporated the misstatement." In re Scientific-Atlanta, 571 F. Supp. 2d at 1337 (quoting Basic, 485 U.S. at 247).

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

Basic, 485 U.S. at 241-42 (citation and internal quotations omitted).

Pursuant to the fraud-on-the-market theory, a plaintiff is entitled to a rebuttable presumption of reliance if he can show:  "(1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed." Greenberg v. Crossroads Sys., Inc., 364 F.3d 657, 661 (5th Cir. 2004) (citing Basic, 485 U.S. at 248 n.27.)  In turn, the Defendants may rebut a presumption of reliance by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic, 485 U.S. at 248.

The Plaintiffs allege that the Defendants in this case "made material misrepresentations or omissions in public statements, which operated as a fraud on

the market." (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification 19.)  In responding to the Motion for Class Certification, the Defendants argue that individual issues regarding reliance predominate over common questions of law and fact.  (Mem. in Opp'n to Mot. for Class Certification 3.)  They assert alternatively that (1) Mr. Brown has not discharged his burden of establishing the presumption of reliance; and/or (2) the presumption has been rebutted by the Defendants.  The dispute between the parties centers on the issue of market efficiency, which is where the court begins its analysis.

### a.      Efficient Market Inquiry

"Before an investor can be presumed to have relied upon the integrity of the market price" he must demonstrate that the market for the security was "efficient." In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 7 (1st Cir. 2005). " Efficiency refers to the flow of information in the relevant market and the effect of that information on the price of the stock. . . . In an efficient market, the defendant's misrepresentations are said to have been absorbed into, and are therefore reflected in, the stock price." Id. at 7-8.  Where the market is not efficient, "there is no assurance that the market price was affected by the defendant's alleged misstatement at all.  Instead, the price may reflect information wholly unrelated to the misstatement."  Id. at 8.  In determining whether a security trades on an efficient market, courts have

considered the following factors:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts 'showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price'; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

Unger v. Amedisys Inc., 401 F.3d 316, 323 (5th Cir. 2005) (footnote omitted) (citing

Cammer v. Bloom, 711 F. Supp 1264, 1286-87 (D.N.J. 1989) (discussing and using the

first five factors); Krogman v. Sterritt, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) (using

the last three factors)); see also In re Scientific-Atlanta, 571 F. Supp. 2d at 1338.[6]

---

[6]While Mr. Brown cites to LaGrasta v. First Union Securities Inc., No. 2:01-CV-251-FTM29DNF, 2005 WL 1875469, at *11 (M.D. Fla. 2005) for the proposition that the mere listing of a security on a particular exchange satisfies the burden of proof required for a finding of efficiency, Defendants cite to a number of cases stating the opposite. See, e.g., In re PolyMedica Sec. Litig., 453 F. Supp. 2d 260, 266 (D. Mass. 2006) ("[I]t is generally accepted that a stock's listing on a national exchange does not, by itself, establish that the stock trades in an efficient market."); Cammer, 711 F. Supp. at 1287 ("It is not logical to draw bright line tests—such as whether a company is listed on a national exchange . . . to assist fact finders in determining whether a stock trades in an 'open and efficient market'."). The court finds that the listing of NetBank stock on the NASDAQ is relevant but not determinative to the efficiency inquiry. See In re PolyMedica, 453 F. Supp. 2d at 266 ("Given, however, that listing on such an exchange undisputably improves the market structure for trading in a particular stock, the Court agrees that one would be hard-pressed to deny the relevance of this fact in an efficiency analysis.").

Proof of every single factor is not always necessary, and "once a court endeavors to apply these factors, they must be weighed analytically, not merely counted, as each of them represents a distinct facet of market efficiency." Unger, 401 F.3d at 323.

> The question of how much evidence of efficiency is necessary for a court to accept the fraud-on-the-market presumption of reliance at the class-certification stage is therefore one of degree. District courts must draw these lines sensibly, mindful that evidence of fundamental value may be relevant to the determination of informational efficiency, but other more accessible and manageable evidence may be sufficient at the certification stage to establish the basic facts that permit a court to apply the fraud-on-the-market presumption.

In re PolyMedica, 432 F.3d at 17. Notably, "courts have wide latitude in deciding what factors to apply in a given case, and what weight should be given to those factors." Id. at 18.

In support of his argument that the fraud-on-the-market presumption should apply, Mr. Brown offers an expert report by R. Alan Miller ("Mr. Miller"). Mr. Brown submits that Mr. Miller is a widely-recognized and experienced financial expert, and that his report (the "Miller Report") "establishes plainly that NetBank's common stock traded on an efficient market." (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification 22.) The Motion for Class Certification references the Miller Report, which offers Mr. Miller's opinions as to: (1) the listing and active trading of NetBank securities on the NASDAQ; (2) the average weekly trading volume of NetBank stock; (3) the number of brokerage houses and/or broker/dealers

following and reporting on the stock; (4) NetBank's authorization to file S-3 registration statements[7]; (5) the number of market makers covering NetBank stock; (6) NetBank's market capitalization; (7) the average bid-ask spread for sales of NetBank stock; and (8) the float range. (Id. at 22-23.)  Mr. Brown states that these facts demonstrate that the Plaintiffs are entitled to a presumption of reliance because the stock traded in an efficient market during the Class Period.  He adds that these facts will be proven using evidence common to the entire class, and concludes that common issues of law and fact therefore predominate, satisfying the first element of the Rule 23(b)(3) inquiry.

In response, Defendants argue that the Miller Report fails to identify empirical facts relating to the most important market efficiency factor — whether unexpected corporate events or financial releases create an immediate response in the stock price.  (Mem. in Opp'n to Mot. for Class Certification 6.)  They likewise assert that Mr. Brown has not shown loss causation, which they assert is fundamental to the fraud-on-the-market presumption.  Many of the Defendants' arguments relate to the statistical significance of Mr. Miller's calculations, and they

---

[7]"Form S-3 is reserved for companies whose stock is actively traded and widely followed.  To file a Form S-3, a company must have filed SEC reports for twelve consecutive months and possess a seventy-five million dollar market capitalization level."  Unger, 401 F.3d at 323 n.5.

have provided testimony and a report by their own expert, David Tabak, Ph.D.

("Dr. Tabak") to support their assertions.[8]  The court will now determine whether

Mr. Brown has sufficiently demonstrated efficiency of the market in which the

NetBank securities were traded for purposes of the class certification motion.

### (1)    Average Weekly Trading Volume

"A high average weekly trading volume suggests market efficiency since it

---

[8]Both sides have also filed Daubert motions challenging the other side's expert—effectively creating a battle of the experts.  However, performing Daubert analyses at this stage of the litigation, in the context of class certification, would be inappropriate.  See, e.g., Drayton v. W. Auto Supply Co., No. 01-10415, 2002 WL 32508918, at *6 n.13 (11th Cir. Mar. 11, 2002) (stating that a district court does not address the merits of the claims at the class certification stage, affirming the district court's refusal to conduct a Daubert analysis at the class certification stage, and stating that "[a]ppellants have presented no authority establishing a court must perform a Daubert inquiry of scientific evidence at this early stage of a class action proceeding.  The district court indicated it will address this issue as this case progresses, which we find sufficient."); LaBauve v. Olin Corp., 231 F.R.D. 632, 644 (S.D. Ala. 2005) (refusing to conduct a Daubert investigation at the class certification stage, and stating "[u]nder no circumstances may a district court weigh conflicting expert evidence or engage in statistical dueling of experts for Rule 23 purposes.") (citation and internal quotations omitted); In re Polypropylene Carpet Antitrust Litig., 996 F. Supp. 18, 26 (N.D. Ga. 1997) (Murphy, J.) ("The question whether Dr. Asher's study is admissible under Daubert, however, is not presently before the Court.  At the class certification stage, the Court simply examines whether Dr. Asher's methodology, as proposed, will comport with the basic principles of econometric theory, will have any probative value, and will primarily use evidence that is common to all members of the proposed class."); Reid v. Lockheed Martin Aeronautics Co., 205 F.R.D. 655, 661 (N.D. Ga. 2001) (Forrester, J.) (on motion for class certification, holding the defendants' motions to exclude the plaintiffs' experts in abeyance). Therefore, the Daubert motions will be HELD IN ABEYANCE.

implies 'significant investor interest in the company' and 'a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information'." In re Xcelera.com Sec. Litig., 430 F.3d 503, 514 (1st Cir. 2005) (quoting Cammer, 711 F. Supp. at 1286). "This indicator appears to be one of the most important in gauging the efficiency of the market for a particular stock." Krogman, 202 F.R.D. at 474. The Cammer court cited authority stating that an average weekly trading of two percent or more of outstanding shares "would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." Cammer, 711 F. Supp. at 1286.

Mr. Miller explains that average weekly trading volume is "the total trading volume for the period being studied divided by the number of weeks in the period." (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B ¶ 19.) He provides calculations supporting the argument that "NetBank experienced substantial weekly trading volume during the Class Period," and states that NetBank had between 46,236,885 and 46,586,415 shares outstanding during the Class Period. (Id.) Mr. Miller calculates that the midpoint of this range is 46,411,650, and that two percent of this is equal to 928,233 shares. He concludes that NetBank had 1,368,983 average weekly shares traded, and this amounts to greater than two percent weekly trading volume. The court finds that this first factor weighs in favor of market

efficiency.

### (2)    Number of Securities Analysts Following and Reporting

"[T]he greater the number of securities analysts following and reporting on a company's stock, the greater the likelihood that information released by a company is being relied upon by investors." In re Xcelera.com, 430 F.3d at 514. The existence of a significant number of securities analysts implies that company reports are "closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." Cammer, 711 F. Supp. at 1286.

The Miller Report states that Tomson Financial's database of analyst reports, Investext, "lists 114 analyst reports from 14 analysts during the Class Period." (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B ¶ 20.) Likewise, Mr. Miller says that Reuters' database of analyst reports, Multexnet, lists 114 reports from 15 analysts. (Id.) Mr. Miller acknowledges that some of these may "overlap" and that the two sources at times list different types of reports. However, he opines that this is more than adequate coverage to support a conclusion of market efficiency. The court thus concludes that this factor also weighs in favor of a finding of market efficiency. See In re Scientific-Atlanta, 571 F. Supp. 2d at 1338-39 (finding that where twenty different analysts issued reports on the company in one year, this factor was among those weighing heavily in favor of market efficiency).

### (3)    Market Makers and Arbitrageurs

"The existence of market makers and arbitrageurs . . . ensure[s] completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." Cammer, 711 F. Supp. at 1286-87. "A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security), and who stands ready to buy or sell at these publicly quoted prices." In re Xcelera.com, 430 F.3d at 515 (citations and internal quotations omitted). Arbitrageurs "are professional investors who exploit price differences in different markets by buying and selling identical securities in those markets," and "both play an important role in keeping markets efficient." Id. at 515 n.13. Importantly, a number of courts have acknowledged a "growing concern that the mere number of market makers, without further analysis, has little to do with market efficiency." Unger, 401 F.3d at 324 (citing cases); see also Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 315 (5th Cir. 2005); O'Neil v. Appel, 165 F.R.D. 479, 502 (W.D. Mich. 1996) (citing a study that "found no empirical correlation between the number of market makers and the efficiency of the market," and indicating that "it is impossible to accord much significance to the number of market makers, until one knows the volume of shares

that they committed to trade, the volume of shares they actually traded, and the prices at which they did so."); <u>In re HealthSouth Corp. Sec. Litig.</u>, 257 F.R.D. 260, 281 (N.D. Ala. 2009) (analyzing the "short interest" in HealthSouth common stock in terms of volume of shares, as well as their actual ownership).

The Miller Report states that during the Class Period, NetBank had at least 73 different market makers "participating in the market for its common stock." (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B ¶ 21(b).)  Mr. Miller compares this to the average of 20 market makers covering each NASDAQ stock in 2005.  He also says that of the top ten largest NASDAQ market makers in October 2006 and March 2007, "seven had positions in NetBank; in May 2007, six of the ten largest market makers had positions in NetBank."  (<u>Id.</u> ¶ 21(c).)  However, he does not provide any additional information, such as (1) the volume of shares these market makers committed to trade; (2) the volume of shares they actually traded; or (3) the prices of these traded shares.

Because the number of market makers alone is of limited usefulness in determining market efficiency, the court finds that this factor is of little help to the inquiry, and that it does not weigh in favor of market efficiency.  <u>See</u> <u>Unger</u>, 401 F.3d at 324.

### (4)    Eligibility to file SEC Form S-3

"Cases finding market efficiency have focused on eligibility for filing of an S-3 Registration Statement, finding that the SEC permits it only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary."  Krogman, 202 F.R.D. at 476 (citation and internal quotations omitted); accord Cammer, 711 F. Supp. at 1287.  SEC regulations state that certain companies may use the S-3 form to register their securities " if they are sufficiently large and have filed reports with the SEC for the requisite period of time." Krogman, 202 F.R.D. at 476.  Therefore, those that are permitted to file an SEC Form S-3 are "presumed to be actively traded and widely followed."  Id.; see also In re HealthSouth, 257 F.R.D. at 281; In re Scientific-Atlanta, 571 F. Supp. 2d at 1339 n.17.

The Miller Report states, and the Defendants do not dispute, that "NetBank qualified for this type of registration during the Class Period based on the market capitalization factor and to the extent it was current with its SEC filings."  (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B ¶ 22.)  Therefore, the court finds that this factor weighs in favor of a finding of market efficiency.

### (5)    Market Capitalization

"Market capitalization . . . may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." Krogman, 202 F.R.D. at 478. This figure is calculated by multiplying the number of shares by the prevailing share price. Id. The Miller Report gives market capitalization figures for eight different points in time during the Class Period, and the market capitalization rates range from $246,386,421.36 to $432,150,737.31. (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B ¶ 24.) Mr. Miller then compares NetBank's market capitalization to the remaining 3,214 stocks in the NASDAQ Composite Index, which is a market capitalization-weight index of stocks "comprising the three NASDAQ classifications." (Id.) Ranking these stocks by their market capitalization, NetBank was ranked 913, and Mr. Miller states that as of March 16, 2005, NetBank was in the top 30th percentile. (Id.) As of December 29, 2006, NetBank ranked 1,653 out of 3,150 stocks in the NASDAQ Composite, which equates to the top 52nd percentile.

Accordingly, the court finds that NetBank's market capitalization weighs in favor of a determination of market efficiency. See, e.g., In re Scientific-Atlanta, 571 F. Supp. 2d at 1339 (finding this factor weighed in favor of market efficiency when the company's market capitalization placed it in the top one-third of its peers);

Krogman, 202 F.R.D. at 478 (finding this factor weighed slightly in favor of market efficiency when the company's market capitalization was in the top sixty percent of the sample group).

### (6)    Bid-Ask Spread

"The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." Krogman, 202 F.R.D. at 478; see also Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B. ¶ 25.  It follows that a large bid-ask spread indicates an inefficient market, "because it suggests that the stock is too expensive to trade." Krogman, 202 F.R.D. at 478.  The Miller Report states that NetBank's average daily bid-ask spread is $0.016, or 0.29% of the average stock price.  (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B. ¶ 25.)  Mr. Miller concludes that "these are very tight spreads and low percentages," which indicate market efficiency.  (Id.)  The court agrees, and finds that NetBank's bid-ask spread likewise weighs in favor of market efficiency.  See In re Scientific-Atlanta, 571 F. Supp. 2d at 1339 (finding that a bid-ask spread that "never exceeded 1.9%" weighed heavily in favor of market efficiency).

### (7)    Float

Mr. Miller next explains that the "float" is the number of shares available for trading by the public. (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B ¶ 26.)  This figure is calculated by subtracting the number of shares held by insiders from the total number of shares outstanding. (Id.) "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security." Krogman, 202 F.R.D. at 478 (citation and internal quotations omitted).  The Miller Report gives a summary of NetBank's insider holdings as disclosed in its proxy statements filed between 2004 to 2006.  He then states that the float rates range from 92.63% to 93.68%. (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B ¶ 26.) Mr. Miller asserts, and Defendants do not disagree, that market efficiency is supported by the "high percentage of shares available for public trading to the total shares outstanding." (Id.) The court agrees, and finds that this factor weighs in favor of market efficiency. See In re Scientific-Atlanta, 571 F. Supp. 2d at 1339 (finding that the float exceeding 96% during the class period weighed heavily in favor of a finding of market efficiency).

(8)    **Cause and Effect Between Unexpected Events or Releases and Immediate Response in Price**

Finally, the court considers the reaction of NetBank's stock price to unexpected news events.  "Evidence that unexpected corporate events or financial releases cause an immediate response in the price of a security has been considered 'the most important Cammer factor'."  Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 207 (2d Cir. 2008) (quoting In re Xcelera.com, 430 F.3d at 512); see also Cammer, 711 F. Supp. at 1287 (deeming evidence of this as "the essence of an efficient market and the foundation for the fraud on the market theory."); In re 2TheMart.com, Inc. Sec. Litig., 114 F. Supp. 2d 955, 964 (C.D. Cal. 2000) (recognizing that this "may be the most significant factor in determining market efficiency.").  "[I]n an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information."  Krogman, 202 F.R.D. at 477.

The Miller Report begins by stating that for the Class Period, the Factiva.com news service lists 1,930 articles mentioning NetBank, 622 of which were from "major" sources.  (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B ¶ 23(b).)  In addition, NetBank regularly filed reports with the Securities and Exchange Commission through November 2006, issued press releases about its results, and conducted investor conference calls.  (Id.)  Mr. Miller opines that this

providing of information kept the market apprised of its "performance and prospects." (Id.) Mr. Miller also provides a summary in his Report of dates on which there were large percentage changes in the price of NetBank stock that corresponded with news events. Exhibit G to the Miller Report provides a price and volume chart that tracks by date NetBank's price and volume of stock outstanding. Exhibit H provides a 102-page event study[9] with the following information for each day within the period ranging from 3/16/2005 through 5/21/2007: (1) the relevant date; (2) trading volume; (3) closing price; (4) percentage price change; (5) dollar amount price change; (6) NASDAQ bank index; (7) percentage index change; (8) predicted NetBank percentage change; (9) the residual, or actual minus predicted NetBank percentage change; (10) the dollar amount of the change in NetBank stock not explained by the NASDAQ bank index change; (11) whether there was a statistical significance between the NetBank and index change; and (12) the headlines of any news items issued on that date. (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. H.) This event study identifies numerous dates on

---

[9]An event study "analyzes the responsiveness of a security's price (or, equivalently, a security's return) to announcements that contain new information, and is the preferred and predominant method for assessing the . . . efficiency of any market." In re Scientific-Atlanta, 571 F. Supp. 2d at 1339 n.19 (citation and internal quotations omitted).

which news information was released and statistically significant price changes occurred in NetBank stock.

Defendants assert that the Miller Report "fails to identify empirical facts showing a consistent stock price response to release of new information about NetBank." (Mem. in Opp'n to Mot. for Class Certification 7.) They first argue that although there were over 549 class period trading days, the Miller Report "relies on a statistically invalid sample of three dates . . . for his empirical analysis." (Id. at 7-9) (internal quotations omitted). They assert that "[t]o approach usefulness, an analysis should statistically compare all news days with all non-news days," and they provide the Declaration and Expert Report of Dr. Tabak in support. (Id. at 9.) The Defendants also argue that "even if NetBank's stock price did in fact respond to the news Mr. Miller identifies," two of the three dates listed in his Report "actually demonstrate the *in*efficiency of the market for NetBank stock." (Id. at 10.) They state that for the March 5, 2007 and May 17, 2007 disclosures, the information identified had already been disclosed to the market on previous occasions. Finally, the Defendants argue that although Mr. Miller was told that NetBank's stock price

exhibited "negative serial auto correlation"[10] — indicating an inefficient market — he ignored this critical information.  (Id. at 11.)

As an initial matter, the Miller Report listed "[a] few examples" of dates on which there were large percentage changes in NetBank stock that corresponded with important news events.  (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification Ex. B ¶ 23(c).)  However, Mr. Brown explains that Mr. Miller used more than three dates in his calculations, instead conducting an event study that listed *every day in the Class Period with and without news*, calculating the statistical significance of the stock price response for each day.  In addition, Mr. Brown includes with his Reply Brief a Rebuttal Expert Report and Declaration of Professor Israel Shaked ("Mr. Shaked").[11]  Mr. Shaked conducted his own test, comparing

---

[10]"Negative serial auto correlation means that the stock exhibits a consistent pattern of price movement in the opposite direction of its price movement the prior day."  (Mem. in Opp'n to Mot. for Class Certification 11) (internal quotations omitted).

[11]The Defendants have submitted a Sur-Reply brief in response to the Plaintiff's Reply.  The Rules of this court do not provide for such extensive briefing, nor is the brief even close to being timely.  The filing of a brief in August as it relates to a motion filed in April robs the court of any predicable process by which it can reliably assume that an issue is ready for ruling.  Furthermore, the Sur-Reply brief is not persuasive, insofar as it essentially seeks to reargue points already raised by the Defendants in their Response brief.  While the Defendants argue in their Sur-Reply that Mr. Miller admitted that the market for NetBank stock did not satisfy the weak form of market efficiency, they provide only piecemeal citations to the deposition.  This leaves the court to guess at the context surrounding the statements.  The Defendants  subsequently seek to

news days to non-news days, and the corresponding movement in NetBank stock price. Mr. Shaked found that "the standard deviation of the news day returns was greater than non-news day returns." (Reply Mem. of Law in Further Supp. of Pl.'s Mot. for Class Certification Ex. D ¶ 65.) He concluded that his test demonstrated that the price of NetBank stock moves more on news days than non-news days, and this in turn indicates a cause-and-effect relationship between the release of new information and reactions of stock price. (Id. ¶ 66.)

As stated previously, the court will not engage in the parties' battle of the experts at the class certification stage. Instead, it finds the Defendants' arguments concerning Mr. Miller having used insufficient numbers of data points, and that two of these days demonstrated market inefficiency, to be unpersuasive. This is true in light of (1) the actual study performed by Mr. Miller and (2) the subsequent study and findings by Mr. Shaked.[12] Furthermore, Defendants' arguments on the cause-

---

further engage the court in their "battle of the experts" — a topic that the court has made clear it will not address at this juncture. (See Defs.' Sur-Reply Mem. in Opp'n to Pl.'s Mot. for Class Certification 6-7.) Finally, the Defendants complain that Mr. Brown submitted two new expert reports along with his Reply. As the court has now given the Defendants an opportunity to respond to these expert reports through the filing of a sur-reply brief, it finds that there is no prejudice to the Defendants resulting from consideration of this evidence. See In re Scientific-Atlanta, 571 F. Supp. 2d at 1339 n.18.

[12]The Defendants argue that In re PolyMedica, 453 F. Supp. 2d at 269, is persuasive. In that case, the court found that Mr. Miller's cause and effect relationship study "le[ft] much to be desired," as he provided only a listing of

and-effect factor are insufficient to overcome a prima facie showing of market efficiency at the class certification stage. See In re Scientific-Atlanta, 571 F. Supp. 2d at 1339 (declining to find the market inefficient, in part because defendants produced a study relating to only one of the nine factors identified to determine market efficiency); see also In re Profit Recovery Group Int'l, Inc. Sec. Litig., 01:cv-1416-CC, Order dated Dec. 3, 2002 at 33 (Cooper, J.) (agreeing with other courts "that have held a counter showing by defendants on the fifth Cammer element is insufficient to overcome Plaintiffs' prima facie showing of an efficient market at the class certification stage.") (citing cases).

There are also several problems with Defendants' argument that Mr. Miller knew that NetBank's stock price exhibited negative serial autocorrelation but ignored this information. Defendants argue that this indicates market inefficiency because negative serial autocorrelation means the stock's price has a predictable

_____

the ten largest stock price movements during the entire alleged class period, half of which corresponded with significant news items. Id. However the current case is distinguishable because, as explained, Mr. Miller has conducted an event study that includes every single day of the Class Period, both with and without news. This is a far cry from reporting movement on only a handful of significant news days. See id. Likewise, the PolyMedica court stated that upon the evidence provided, it "might well have been inclined to deem such a showing sufficient for class certification purposes," but declined to do so because PolyMedica had also offered evidence affirmatively suggesting an inefficient market. Id. at 270. The present case is also distinguishable from PolyMedica on this ground.

component and "information about the stock is not fully and immediately incorporated into the stock's price." (Mem. in Opp'n to Mot. for Class Certification 12.) However, although Defendants assert that Mr. Miller ignored information on negative serial autocorrelation, they have not provided any actual evidence that Mr. Miller was in fact aware of the presence of this phenomenon.[13]

Defendants also cite to Dr. Tabak's analysis, which they assert "confirmed the existence of strong evidence of negative serial auto correlation with respect to NetBank stock." (Mem. in Opp'n to Mot. for Class Certification 12 n.7) (citing id. Ex. 1 ¶¶ 20-22.) Mr. Brown argues that there is no evidence that the market for NetBank stock exhibited statistically significant negative autocorrelation ("SSNAC") during the Class Period, but that even if it did, this is insufficient to defeat a finding of market efficiency. (Reply Mem. of Law in Further Supp. of Pl.'s Mot. for Class Certification 9.) He then cites to the Declaration and Rebuttal Expert Report of Abraham Wyner, Ph.D. ("Dr. Wyner"), which concluded that Dr. Tabak's finding of SSNAC was wrong because (1) it improperly applied statistical significance tests; (2) failed to reveal and consider a crucial discrepancy in his data and analyses that undermined his conclusion; and (3) made incorrect assumptions that SSNAC can

---

[13]The portion of Mr. Miller's transcript provided by Defendants does not support that he had knowledge of this phenomenon.

be used to generate abnormal profits that violate the efficient market hypothesis.

As set out above, at this juncture the court finds it inappropriate to delve into the merits of the case, and entertain the parties' battle of the experts. Importantly, even if NetBank's stock were to demonstrate negative autocorrelation, this would constitute only one factor weighing against a finding of efficiency. See In re DVI Inc. Sec. Litig., 249 F.R.D. 196, 213 (E.D. Pa. 2008) (finding that although the security demonstrated autocorrelation, which suggested an inefficient market, other factors it had analyzed weighed in favor of efficiency, which resulted in the conclusion that DVI's common stock traded in an efficient market). Therefore, this factor alone is insufficient to demonstrate inefficiency of the market for NetBank securities.

After analyzing the above factors, nearly all of which weigh in favor of a finding of market efficiency, the court finds that Mr. Brown has met his burden of demonstrating that the market for NetBank securities was efficient. Therefore, he is entitled to the presumption of reliance afforded by the fraud-on-the-market theory.[14] This is sufficient to demonstrate that the elements of the claims in this case

---

[14]Defendants devote a considerable portion of their Response in Opposition to the Motion for Class Certification arguing that Mr. Brown has not properly shown the element of loss causation, which they assert is "fundamental to the fraud-on-the-market presumption." (Mem. in Opp'n to Mot. for Class Certification 12.) They cite to Oscar Private Equity Investments v. Allegiance Telecom, Inc., 487 F.3d 261 (5th Cir. 2007) in support. In Oscar, the court required that a plaintiff "prove that the defendant's non-disclosure materially

are susceptible to class-wide proof, such that common questions predominate the inquiry — satisfying the first portion of the Rule 23(b)(3) analysis.

### 2.     Superiority

In order to certify a class pursuant to Rule 23(b)(3), "the Court must also find that the class action is superior to other available methods of adjudication." In re Theragenics Corp. Sec. Litig., 205 F.R.D. 687, 697 (N.D. Ga. Mar. 26, 2002) (Thrash, J.). "As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases." In re HealthSouth, 257 F.R.D. at 284. "In making its determination, the Court must find that difficulties in management will not render this action improper for certification." In re Scientific-Atlanta, 571 F. Supp. 2d at 1343 (citations and internal quotations omitted).

Mr. Brown argues that a class action is the superior method for adjudicating the claims in this case as evidenced by the four considerations found in Rule

---

affected the market price of the security" — loss causation — "in order to trigger the fraud-on-the-market presumption." Id. at 265.  However, Defendants do not cite to any Eleventh Circuit authority that requires proof of loss causation at the class certification stage — rather they admit that the Eleventh Circuit has not adopted this requirement, instead arguing that it is "clearly the superior approach."  (Mem. in Opp'n to Mot. for Class Certification 15 n.9.)  As "the Oscar case has never been followed in the Eleventh Circuit . . . this court will not be the first to adopt it."  In re HealthSouth, 257 F.R.D. at 283.  In any event, this court has already held that Mr. Brown made a sufficient proximate causation showing in its January 29, 2009 Order denying the Defendants' Motion to Dismiss. (Order, Jan. 29, 2009 at 34-37.)

23(b)(3).  See supra, at 15.  He first states that "there is little realistic concern for 'the class members' interests in individually controlling the prosecution or defense of separate actions.'"  (Pl.'s Mem. of Law in Supp. of Mot. for Class Certification 24) (quoting Fed. R. Civ. P. 23(b)(3)(A)).  He next asserts that there is no other known competing litigation concerning the controversy, and says that to the contrary, "all similar class actions involving NetBank were consolidated in this Court at the beginning of this case."  (Id.)  Mr. Brown states that in consolidating the case, this court has expressed a desirability of concentrating the litigation of the claims in this forum, meeting the third Rule 23(b)(3) consideration.  Finally, Mr. Brown explains that this is "a fairly typical securities class action comprised of uniform claims, [and as a result] there is no reason to believe it will present unusual management difficulties."  (Id. at 25.)

After considering the factors set forth in Rule 23(b)(3), the court finds that a class certification is the superior method for adjudicating this case.  Any interest that the individual members of the class may have in controlling the litigation is greatly outweighed by the benefit of distributing the financial burden of the litigation among the class.  See In re Scientific-Atlanta, 571 F. Supp. 2d at 1344.  Likewise, the court does not believe that there will arise any difficulties in the management of this case that are not otherwise present in any large securities class action.  Therefore,

the superiority requirement of Rule 23(b)(3) has been satisfied.          Having found

that Mr. Brown has met the Rule 23(a) and Rule 23(b)(3) requirements for class

certification of the present action, the court hereby certifies the following class:  All

persons who, during the period March 16, 2005 through and including May 21,

2007, purchased or otherwise acquired the publicly-registered common stock of

NetBank, Inc., held such stock as of May 21, 2007, and were damaged as a result

("the Class").  Further, Mr. Brown is hereby certified as the representative of the

Class, and Mr. Brown's counsel, Berger & Montague, P.C., are approved as class

counsel to the litigation.  The court now turns to the parties' Motions to Compel.

### C.    Motions to Compel

Both the Defendants and Mr. Brown have filed a Motion to Compel.  The

court will first address the Defendants' Motion, filed by Mr. Brown's Motion.

### 1.    Defendants' Motion to Compel

In their Motion to Compel, the Defendants request an order requiring the

Plaintiffs to answer Interrogatories 1-7 seeking specific identification of confidential

witness sources that the Plaintiffs relied upon in alleging their securities fraud

claims. Specifically, Defendants describe that there are twenty-seven paragraphs

of allegations in the Amended Complaint that "set[] forth information allegedly

known to unnamed confidential witnesses purporting to describe:  (1) allegedly

-42-

material information about NetBank that Plaintiff contends was misrepresented or improperly concealed and (2) Defendants' alleged knowledge or reckless disregard of such information."   (Mem. of Law in Supp. of Defs.' Mot. to Compel 2-3.) Defendants assert that they are entitled to this information, particularly in light of this court's January 29, 2009 Order citing to these confidential witnesses' allegations in support of its determination that Mr. Brown had sufficiently alleged claims for violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934.  (Id. at 4.)[15]

The Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including . . . the identity and location of persons who know of any discoverable matter."  Fed. R. Civ. P. 26(b)(1).  The Supreme Court has construed relevance broadly to include "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."

_____

[15]The parties have engaged in good faith efforts to resolve this dispute prior to Defendants filing a Motion to Compel.  On March 17, 2009, Defendants' counsel wrote a letter to Mr. Brown's counsel requesting identification of the confidential witnesses at issue.  That same day, counsel for the parties participated in a telephone call which discussed, in part, this discovery matter. Two subsequent phone conversations occurred, on March 26 and 27, 2009, during which the parties again discussed this discovery issue.  On April 3, 2009, Defendants filed the current Motion to Compel.

Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978).  Likewise, it has stated

that "discovery rules are to be accorded a broad and liberal treatment. . . . Mutual

knowledge of all the relevant facts gathered by both parties is essential to proper

litigation."  Hickman v. Taylor, 329 U.S. 495, 507 (1947).

In his Initial Disclosures, Mr. Brown identified over 130 individuals "likely

to have discoverable information that plaintiff may use to support his claims and

defenses."  (Pl.'s Initial Disclosures at 4-5, 10-30.)  These individuals are identified

along with their "subject area of likely discoverable information."  (Id. at 10-30.)

Consequently, Mr. Brown first responds to Defendants' Motion to Compel by

arguing it is without merit, as the list of 130 individuals he provided contains the

confidential witnesses whose identification Defendants now seek.[16]  (Mem. of Law

in Opp'n to Defs.' Mot. to Compel 1.)  However, this argument is not persuasive.

"It is clearly established that Defendants may discover the facts upon which

Plaintiffs base their allegations and such facts include names of witnesses from

whom counsel obtained their information."  In re Theragenics Corp. Sec. Litig., 205

---

[16]In spite of Defendants' arguments to the contrary, Mr. Brown makes clear that he "has not invoked the work product doctrine in objecting to the specification . . . of the confidential informants."  (Mem. of Law in Opp'n to Defs.' Mot. to Compel 8.)

F.R.D. 631, 636 (N.D. Ga. Mar. 5, 2002) (Thrash, J.).[17]  The Reform Act, 15 U.S.C.

§ 78u-4(b)(1), dictates that in securities fraud cases, plaintiffs shoulder "the burden

of identifying the sources for allegations pled on information and belief." Id. (citing

15 U.S.C. § 78u-4(b)(1)).  That Mr. Brown has provided Defendants with a list of 130

individuals, arguing that Defendants can "conduct their own investigation," (Mem.

of Law in Opp'n to Defs.' Mot. to Compel 12), to determine the identities of the

seven confidential witnesses among them, "smacks of a needle-in-haystack search:

time-consuming, wasteful and expensive."    Am. Floral Servs., Inc. v. Florists

Transworld Delivery Ass'n, 107 F.R.D. 258, 261 (D.C. Ill. 1985) (where the plaintiff

provided a 200 person list to the defendant, and argued that it had no further

obligation to specify the two individuals on that list with inculpatory information,

noting that "the 'fox-hunt' theory of litigation [i]s no longer acceptable."); see also

In re Aetna Inc. Sec. Litig., No. CIV. A. MDL 1219, 1999 WL 354527, at *4 (E.D. Pa.

May 26, 1999) (finding that the provision of a list of approximately 750 individuals

was insufficient to satisfy the defendants' request for the identities of individuals

---

[17]Despite Mr. Brown's arguments to the contrary, the fact that the In re Theragenics court made this statement in the context of discussing whether the identities of witnesses are protected by the work product doctrine does not lessen the effect of the ultimate conclusion that the identities were discoverable. This same logic applies to the variety of erroneous distinctions that Mr. Brown argues render Defendants' cited cases inapplicable.

with knowledge pertaining to particular allegations of the complaint, and stating that without the court's intervention, "Defendants would be forced to engage in a time-consuming and expensive effort to ferret out the veritable needle in the haystack. . . . The Court will not allow the discovery process to be subverted in this way."). It therefore follows that this court will not require the Defendants to engage in such a wasteful and time consuming process.[18]

Mr. Brown next asserts that fairness and public policy concerns "shield immediate disclosure of confidential sources at this early stage of the proceeding." (Mem. of Law in Opp'n to Defs.' Mot. to Compel 15.) Specifically, he argues that if the identities of the confidential witnesses are disclosed at this point in discovery, they might be "deterred from providing critical information to investigators." (Id. at 21.) Mr. Brown says that he should not be compelled to disclose their identities in order to protect the informers from "harassment, retaliation, and/or blacklisting." (Id. at 24.) Finally, he asserts that non-production would further the goals of whistle-blower protection.

---

[18]In Mr. Brown's response to Interrogatories 1-7, he states that the request for the identities of the confidential witnesses is "premature[]" and need not be disclosed unless "plaintiff intends to use or rely upon the particular confidential witness at trial." (Mem. of Law in Supp. of Defs.' Mot. to Compel 10.) However, whether or not the Plaintiffs ultimately decide to use the testimony of these confidential witnesses at trial "does not relieve them of the obligation to respond to appropriate discovery." See In re Theragenics, 205 F.R.D. at 637.

While the court is sensitive to the interests of the confidential witnesses at issue, it is nonetheless responsible for enforcing the liberal discovery policies set out by the Federal Rules.  Likewise,

> [t]he fact that a 'whisteblower's' identity may be revealed in litigation is certainly a risk that any such person must take. . . . [However] [t]he discovery rules ensure . . . that a party faced with . . . th[is] type of adverse testimony will learn about that testimony sooner—in discovery—and not just on the witness stand at trial.

Mazur v. Lampert, No. 04-61159-CIV, 2007 WL 917271, at *4 (S.D. Fla. Mar. 25, 2007).  Although Mr. Brown argues repeatedly that his list of 130 individuals gives the Defendants more than enough information to "readily ascertain their identities without further specification," he does not explain why the concerns for these individuals' well-being attach only upon this further disclosure to Defendants. (Mem. of Law in Opp'n to Defs.' Mot. to Compel 10.)  Therefore, these factors cannot justify withholding production of the confidential witnesses' identities.

Finally, Mr. Brown argues that Defendants' Interrogatories 1-7 exceed the limit imposed by Rule 33.  Rule 33 limits the number of interrogatories one party may serve on another at 25, "[u]nless otherwise stipulated or ordered by the court." Fed. R. Civ. P. 33(a)(1).  It likewise provides that "[l]eave to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(2)."  Id. Illustrating Mr. Brown's argument, Interrogatory 1 reads:

> Identify the 'NetBank officer employed in the Corporate Finance Department throughout the Class Period' as alleged in paragraphs 93, 160, and 227 of the Complaint, and identify and describe with particularity all documents, facts, or information upon which the allegations set forth in those paragraphs of the Complaint are based. If the referenced employee is more than one individual, then identify each individual referenced in each specific paragraph.

(Mem. of Law in Supp. of Defs.' Mot. to Compel 9.)  Mr. Brown argues that this

> comprises four separate interrogatories which should be read and counted as follows:
>
> 1. Identify the 'NetBank officer employed in the Corporate Finance Department throughout the Class Period' as alleged in paragraphs 93, 160, and 227 of the Complaint.
>
> 2. Identify and describe with particularity all documents, facts, or information upon which the allegations set forth in paragraph 93 of the Complaint are based.
>
> 3. Identify and describe with particularity all documents, facts, or information upon which the allegations set forth in paragraph 160 of the Complaint are based.
>
> 4. Identify and describe with particularity all documents, facts, or information upon which the allegations set forth in paragraph 227 of the Complaint are based.

(Mem. of Law in Opp'n to Defs.' Mot. to Compel 5.)  As a result, he argues that

Interrogatories 1-7 actually comprise 34 separate interrogatories, and concludes that

in the event the court grants Defendants' Motion, he should only be required to

respond to Interrogatories 1-5 (which he alleges contain 25 actual interrogatories).

In <u>Williams v. Taser International, Inc.</u>, No. 1:06-CV-0051-RWS, 2007 WL

1630875, at *2 (N.D. Ga. 2007) (Story, J.), the court addressed the defendant's argument that the plaintiffs' interrogatories were in excess of those permitted pursuant to Rule 33. The Williams court used a "related question test" to determine whether the various subparts of plaintiffs' interrogatories were discrete and in violation of Rule 33. Id. This test asks "whether the particular subparts are logically or factually subsumed within and necessarily related to the primary question." Id. (citation and internal quotations omitted). If so, "then the subpart is not 'discrete' within the meaning of Rule 33(a)." Id.

First, the court finds that the subparts of Defendants' Interrogatories 1-7 are "logically or factually subsumed within and necessarily related" to the primary question—which centers on the allegations set forth by the confidential witness at issue. Id. However, even were this not the case, it has been said that "an overly restrictive reading of Rule 33's numerical limit would too quickly exhaust the propounding party's supply of interrogatories, and unnecessarily limit that party's fact-gathering ability." Id.; see also Ginn v. Gemini, Inc., 137 F.R.D. 320, 322 (D. Nev. 1991) (noting that requiring each subpart, no matter how narrowly drawn, to be counted as a separate interrogatory, could "too quickly exhaust the propounding party's supply of interrogatories, and unnecessarily cramp the party's fact-gathering ability."). Here, Mr. Brown does not assert, and the court has no reason to believe,

-49-

that Defendants' interrogatories are being improperly used to harass the Plaintiffs. "Legitimate discovery efforts should not have to depend upon linguistic acrobatics, nor should they sap the court's limited resources in order to resolve hypertechnical disputes." Ginn, 137 F.R.D. at 322.  Additionally, strictly adhering to the numerical guidelines set out by Rule 33 would be inconsistent with the Federal Rules' notions of broad discovery, and prevent both parties from "narrowing the factual issues to be resolved at trial [as well as] ensuring that all parties to litigation are possessed of relevant facts." Williams, 2007 WL 1630875, at *2 (citing Shelak v. White Motor Co., 581 F.2d 1155, 1159 (5th Cir. 1978)) (federal discovery rules are designed to narrow and clarify issues and to give parties mutual knowledge of all relevant facts, thereby preventing surprise).  Thus, the policies behind liberal discovery necessarily dictate that Defendants be permitted to exceed the limitations set by Rule 33.

The court therefore grants Defendants' Motion to Compel, and orders the Plaintiffs to identify with specificity the identities of the confidential witnesses, as requested by Defendants' Interrogatories 1-7.

### 2.    Plaintiff's Motion to Compel

Mr. Brown has raised a number of issues in his Motion to Compel.  The court will first address his arguments relating to the definition of terms, followed by those pertaining to electronically stored information, Interrogatories 58 and 136,

Interrogatories 3 and 6, and finally, the responsiveness of Defendant Eula L. Adams.

### a.    Definitions of Terms

Mr. Brown first argues that the Defendants should be compelled to withdraw their improper boilerplate objections, and respond fully to the discovery requests.[19] However, the dispute is essentially one about the definition of terms used in Mr. Brown's interrogatories. He first points to the Defendants' response to his request for documents for the relevant time period "January 1, 2005 through the present," that requests "all documents and information produced or created during that period, and shall also include all documents which relate in whole or in part to such

---

[19]Although Mr. Brown takes issue with every single discovery response that uses what he refers to as boilerplate objections, the court confines its analysis to those interrogatories he has specifically discussed in the brief.

> A motion to compel a disclosure under LR 26.1 or to compel a response to discovery conducted pursuant to the Federal Rules of Civil Procedure shall: . . . .
> (2) Quote verbatim each disclosure, interrogatory, deposition question, request for designation of deponent, or request for inspection to which objection is taken;
> (3) State the specific objection;
> (4) State the grounds assigned for the objection (if not apparent from the objection); and
> (5) Cite authority and include a discussion of the reasons assigned as supporting the motion.

LR 37.1(A)(2)-(5), N.D. Ga.

period, or to events or circumstances which occurred during such period." (Mem. of Law in Supp. of Pl.'s Mot. to Compel 6.) Defendants objected to the time frame, calling it "vague and ambiguous," and stated that they would produce only those documents "prepared, generated or published from January 1, 2005 through September 19, 2007."[20] (Id.) However, they say they have subsequently agreed to search for and produce documents generated after September 28, 2007 that may be responsive to Mr. Brown's request, given that they are non-privileged documents. (Defs.' Opp'n to Pl.'s Mot. to Compel 8.) Thus, both parties are now in agreement that Defendants will produce relevant documents for the time period spanning January 1, 2005 through the present, subject to the privileged documents exception. There being no remaining dispute regarding the relevant time period, Mr. Brown's Motion to Compel is denied as moot on this ground.

Mr. Brown next argues that the Defendants have improperly objected to his definition of the term "you." He defined the term as "any and all of your employees, servants, trustees, attorneys, agents, expert or purported expert who is expected to provide any testimony in, or in connection with, the lawsuit, representatives, and all other persons acting on your behalf." (Mem. of Law in

---

[20]The Defendants point out that Mr. Brown's Complaint does not assert a claim based on conduct or statements after May 21, 2007.

Supp. of Pl.'s Mot. to Compel 7.)  Mr. Brown states that each of the Defendants

objected to the interrogatories "to the extent that they seek to require Defendant to

provide information on behalf of third parties.  Defendant responds to the

Interrogatories based solely on information known to him."  (Id.)  However, in their

Response Brief, the Defendants say that they "have agreed to treat the term 'you'

as encompassing any employees, servants, trust[ee]s, attorneys, or agents acting on

Defendants' behalf in this lawsuit."  (Defs.' Opp'n to Pl.'s Mot. to Compel 9-10)

(citation and internal quotations omitted).  As there is not presently any remaining

dispute concerning this term, Mr. Brown's Motion to Compel is likewise denied as

moot on this issue.

Finally, Mr. Brown argues that the Defendants' objections to his definition of

the term "NetBank" are improper.  In his interrogatories Mr. Brown defined the

term as:

> NetBank, Inc. and its predecessors, successors, parents, wholly- or
> partly-owned direct or indirect subsidiaries, divisions, affiliates and
> joint ventures (including but not limited to NetBank, FSB; MG
> Reinsurance Company; NetInsurance, Inc.; and NB Partners, Inc.;
> Market Street Mortgage Corporation; NetBank Payment Systems, Inc.;
> Meritage Mortgage Corporation; Financial Technologies, One; NetBank
> Funding Services; NetBank Business Finance; Dealer Financial Services;
> and Beacon Credit Services) and, unless the context otherwise requires,
> any of their past and current partners, principals, directors, employees,
> representatives and agents.

(Mem. of Law in Supp. of Pl.'s Mot. to Compel 8.)  Initially, Defendants objected to

this definition to the extent that it encompassed entities other than NetBank itself, and re-defined the term "NetBank" to be limited to NetBank, Inc.  (Id. at 8-9.) However, Defendants state that they "are not relying on their objection to Plaintiff's definition of the term 'NetBank' as a basis for withholding responsive, non-privileged documents or information in their possession, custody or control." (Defs.' Opp'n to Pl.'s Mot. to Compel 4.)  Because there does not exist any remaining discovery dispute surrounding the term "NetBank," the court denies as moot Mr. Brown's Motion to Compel on this ground.

### b.    Electronically Stored Information

Mr. Brown next argues that the Defendants should be compelled to produce all electronically stored information ("ESI") in native format.  In response to Mr. Brown's request, the Defendants objected that the Federal Rules do not require production of documents in native format, and instead stated that they would produce documents in Tagged Image File Format ("TIFF").[21]  Mr. Brown says that producing documents in TIFF results in problems including an inability to (1) determine the identity of the author and editors of the documents; (2) determine the creation and modification dates of the documents; (3) determine whether the

---

[21]The court understands "native format" to be akin to the actual Word or Excel file, while TIFF is merely an image of the file.

documents have attachments; and (4) identify, sort, search or filter documents. (Mem. of Law in Supp. of Pl.'s Mot. to Compel 14.)

The Defendants argue that they are not required to produce ESI in any particular format, so long as it is reasonably usable. They state that producing documents in native format "allows the alteration of documents produced and creates difficulties in authenticating and tracking documents produced." (Defs.' Opp'n to Pl.'s Mot. to Compel 14-15.) The Defendants further state that using native format makes it impossible to "Bates label individual pages of a document,"[22] and state that "[a]nother potential drawback with native format production is that one or more of the parties may lack access to the software program or application required to read the native file." (Id. at 15.) Finally, Defendants state that they have agreed to produce spreadsheets in native format, have provided Mr. Brown with the data needed to perform optical character recognition ("OCR") process on 16,483 of 17,958 documents,[23] and are willing to consider on a case-by-case basis, "additional requests to produce particular documents in native format." (Id. at 16-17.)

---

[22]Defendants say "without Bates labeling, record citations are necessarily imprecise, and parties and the Court alike may be forced to scour a range of documents for a single page." (Defs.' Opp'n to Pl.'s Mot. to Compel 15.)

[23]OCR makes the text of a TIFF searchable.

Federal Rule of Civil Procedure 34 states that a party requesting production of electronically stored information "may specify the form or forms in which electronically stored information is to be produced." Fed. R. Civ. P. 34(b)(1)(C). The Advisory Committee Notes to Rule 34 contemplate that "[t]he responding party also is involved in determining the form of production." Fed. R. Civ. P. 34 advisory committee's note, 2006 Amendment, subdivision (b). In the instance that the two sides are in disagreement about the form, and they have met to confer pursuant to Rule 37(a)(2)(B), the requesting party may file a motion to compel, in which case "the court resolves the dispute[.] [T]he court is not limited to the forms initially chosen by the requesting party, stated by the responding party, or specified in this rule for situations in which there is no court order or party agreement." Id.

Although the Defendants have listed a number of hypothetical problems with providing documents in native format, they have not asserted these to be actual problems arising in the present case. For example, the court does not understand the Defendants to be asserting that Mr. Brown or his attorneys will alter the documents they produce. Likewise, neither of the parties in fact lacks access to the software required to read native files. Furthermore, the court is confident that the precision of record citations can be appropriately dealt with should Mr. Brown desire to use any of the documents at issue as exhibits or evidence. In contrast, Mr.

-56-

Brown has definitively stated that the provision of TIFF documents has made "review and analysis much more difficult and expensive," and likewise "conceals (by omission) any metadata[24] known to the Defendants." (Mem. of Law in Supp. of Pl.'s Mot. to Compel 16.) The Defendants having given no good reason why they should not produce Mr. Brown's requested documents in native format, the Motion to Compel production of ESI information in native format is granted.

### c.    Interrogatories 58 and 135

Mr. Brown next argues that the Defendants should be compelled to produce documents responsive to document requests 58 and 135. In objecting to both of these requests, the Defendants stated that some of the information was protected by the attorney-client privilege, the work product doctrine, and/or other recognized privileges. (Mem. of Law in Supp. of Pl.'s Mot. to Compel 17.) However, Mr. Brown states that as of the date of filing his Motion to Compel, the Defendants had

---

[24]Mr. Brown defines metadata as "essentially the who, what, when, where of the information." (Mem. of Law in Supp. of Pl.'s Mot. to Compel 14 n.7) (citation and internal quotations omitted). Metadata reveals the author of the document, as well as who generated the document, where it was stored, who was in possession of the file, when it was created, when and where it was last accessed, and when and where it was last modified or saved. See Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co., No. 6:07-cv-222-Orl-35KRS, 2009 WL 546429, at *2 n.5 (M.D. Fla. Mar. 4, 2009).

not produced a Rule 26(b)(5)(A) log.[25]  In response, the Defendants point out that Rule 26(b)(5)(A) "does not set forth any time requirement for compliance therewith," and state that they have focused their efforts "on expediting production of responsive, non-privileged documents to Plaintiff on a rolling basis."  (Defs.' Opp'n to Pl.'s Mot. to Compel 18-19.)  They likewise say that they "have not yet definitively identified the documents that they will claim to be privileged . . . [and] are working diligently to complete their production of responsive, non-privileged documents and comply with Rule 26(b)(5)(A) as promptly as reasonably possible." (Id. at 20.)

This case was filed on September 19, 2007, and will soon be two years old. Additionally, discovery has been going on for months, and is now set to end on

---

[25]Rule 26(b)(5)(A) states:

When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must:

(i) expressly make the claim; and

(ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Fed. R. Civ. P. 26(b)(5)(A).

September 28, 2009.  Defendants have had plenty of time to create and maintain a privileged documents log in accordance with Rule 26(b)(5)(A), and Mr. Brown is entitled to know the basis upon which the Defendants are claiming privilege relating to Interrogatories 58 and 135.  Mr. Brown's Motion to Compel is therefore granted as to Interrogatories 58 and 135.  Defendants are ordered to produce a privileged documents log, detailing their identification of privileged documents thus far, within ten (10) days of the date of this Order.

### d.    Interrogatories 3 and 6

Mr. Brown next argues that the Defendants should be compelled to answer Interrogatories 3 and 6.  Interrogatory 3 states:  "Describe in detail all communications, oral or written, related to the bankruptcy of NetBank that you have ever had with any other person, excluding privileged communications, and identify and describe all documents that reflect such communications."  (Mem. of Law in Supp. of Pl.'s Mot. to Compel 19.)  In response, the Defendants raised a number of objections, then stated, for example, "[Mr. Adams] had discussions related to the bankruptcy of NetBank, some of which may not have been privileged, involving members of NetBank's board of directors and certain NetBank executives."  (Id. at 20.)  Other Defendants responded using similar language.  (Id. at 20-21.)  Despite the Defendants' arguments that they responded to Interrogatory

3 in good faith, and that "[t]here is nothing further to compel with respect to these responses," (Defs.' Opp'n to Pl.'s Mot. to Compel 23), the court finds that this response lacks sufficient detail to be of any use to Mr. Brown. Therefore, it grants Mr. Brown's Motion to Compel relating to Interrogatory 3, and orders Defendants to fully comply, to the extent that their responses are not protected as privileged communications.

Regarding Interrogatory 6, Mr. Brown requested the following information: "Describe in detail your efforts to locate, identify and produce documents responsive to Plaintiff's First Set of Requests for Production of Documents Directed to [Defendant]." (Mem. of Law in Supp. of Pl.'s Mot. to Compel 21.) Defendants responded with the following:

> Defendant states that he provided his attorneys with copies of all hard and/or electronic documents in Defendant's possession relating to NetBank. Defendant's attorneys are reviewing the documents for privilege and potential responsiveness to Plaintiff[']s document requests, and will produce documents consistent with Defendant's Responses and Objections to Plaintiff[']s First Set of Requests for Production of Documents to Defendant.

(Id. at 21-22.) Mr. Brown argues that this response is incomplete as it does not state "how they located or identified" the documents at issue, and does not confirm that the Defendants provided all documents in their custody or control. (Id. at 22.) Defendants in turn state that the documents in their possession or control

-60-

"constitute the universe of documents within [their] possession, custody, or control to be forwarded to counsel for review and possible production." (Defs.' Opp'n to Pl.'s Mot. to Compel 23-24.) The court finds that the Defendants have sufficiently addressed Mr. Brown's arguments concerning whether or not all of the documents at issue have been provided to Defendants' attorneys. However, there remains the issue of how the Defendants located or identified the relevant documents. Therefore, Mr. Brown's Motion to Compel is granted as to Interrogatory 6, and the Defendants are ordered to describe "how they located or identified" the documents previously described as having been provided to their attorneys.

### e.    Defendant Adams

Finally, Mr. Brown argues that Defendant Eula L. Adams ("Mr. Adams") has failed to produce "a single document," and should therefore be compelled to immediately produce all responsive documents in his possession, custody or control, and likewise provide complete answers to Mr. Brown's Interrogatories. (Mem. of Law in Supp. of Pl.'s Mot. to Compel 22.) Defendants respond by stating that Mr. Adams resigned as an outside director of NetBank in September 2007. (Defs.' Opp'n to Pl.'s Mot. to Compel 24.) They also say that he was not named as a defendant in the original Complaint, and was not added as a party to the case until July 3, 2008. Furthermore, Defendants state that Mr. Adams "did not retain

documents related to his work as an outside director of NetBank . . . [and] [a]ny documents in Mr. Adams's possession . . . that could conceivably be responsive to Plaintiff's discovery requests consist of confidential communications with the attorneys representing him." (Id.) They argue that any such documents are presumptively within the protections of the attorney-client privilege and/or the work-product doctrine, and are not subject to production. (Id. at 24-25.)

While Defendants have sufficiently explained the lack of document production from Mr. Adams, Mr. Brown is entitled to information relating to "the nature of the documents, communications or tangible things not produced or disclosed." Fed. R. Civ. P. 26(b)(5)(A)(ii).[26] Therefore, Mr. Brown's Motion to Compel is granted on this ground, and the Defendants are ORDERED to produce a privileged documents log for all documents for which Mr. Adams is claiming privilege, within ten (10) days of the date of this Order.

## IV. Summary

For the foregoing reasons, Mr. Brown's Motion for Class Certification [Doc. No. 68] is GRANTED. Furthermore, the Defendants' Motion to Compel [Doc. No.

---

[26]This dispute, along with many others in Mr. Brown's Motion to Compel, could have been resolved between the parties without coming to the court for relief. The Rules require the parties to make good faith efforts to resolve discovery disputes amongst themselves before filing any additional motions to compel, and the parties are directed to do so going forward.

67] is likewise GRANTED; and Mr. Brown's Motion to Compel [Doc. No. 75] is GRANTED IN PART, and DENIED IN PART.  The Motion is GRANTED as to Mr. Brown's request for document production in native format; Interrogatories 3, 6, 58, and 135; and compelling Mr. Adams to respond.  The Motion is DENIED AS MOOT as to the definition of the terms "You," "NetBank," and the "Relevant Time Period." Defendants are hereby ORDERED to produce privileged documents logs, detailing their identification of privileged documents thus far, within ten (10) days of the date of this Order.  No extensions of this time period will be granted.  The Motion for Leave to File a Sur-Reply [Doc. No. 104] is GRANTED for the limited purposes stated here.  Discovery is set to conclude on September 28, 2009.[27]

IT IS SO ORDERED, this 7th day of August, 2009.

s/Beverly B. Martin
BEVERLY B. MARTIN
UNITED STATES DISTRICT JUDGE

---

[27]This date was set by the January 29, 2009 Order of the court.  A subsequent automated entry was made on the docket setting a November, 2009 date for close of discovery.  However, this automated entry does not amend the September 28, 2009 date expressly set by Order of the court.